LIBERTY TITLE AND TRUST COMPANY, TRUSTEE UNDER THE WILL OF GUSTAVUS C. SEIDEL, DECEASED, PLAINTIFF-APPELLANT, v. LOUISE PLEWS, ET AL., DEFENDANTS-RESPONDENTS.

Argued October 16, 1950—Decided December 4, 1950.

*Mr. Allen B. Endicott* argued the cause for the appellant (*Messrs. Starr, Summerill & Davis,* attorneys).

*Mr. William Elmer Brown, Jr.,* argued the cause for the respondents, Louise Plews, *et al.* (*Mr. Charles C. Babcock,* attorney for respondents, Lillian Welzel, *et al.*).

*Mr. Augustine A. Repetto* argued the cause for the respondents, Joseph W. Wells, *et al.* (*Messrs. Bolte & Repetto,* attorneys).

The opinion of the court was delivered by.

VANDERBILT, C. J. This appeal comes before us on certification granted the plaintiff to review a decision of the Appellate Division of the Superior Court modifying a judgment of the Chancery Division of that court.

The decedent, Gustavus C. Seidel, died in 1922. By his will he created a trust in the sum of $250,000, the income to be paid to his widow for life and upon her death the sum of $150,000 to be paid to her appointees, the remaining $100,000 to become a part of his residuary estate. The plaintiff, a trust company, which conducted a general banking business in Philadelphia and maintained a trust department represented

to be equipped to handle trust estates, was designated as trustee under the will and in 1923 took over the administration of the trust.

In 1932 the trustee filed its first intermediate account in the Orphans' Court of Atlantic County. The account as filed showed an increase in the *corpus* of the trust from $247,031.34 ($250,000 less transfer inheritance taxes of $2,968.64) to $432,373.81, a principal gain of $185,342.47. This remarkable increase was directly attributable to profits from the sale of certain stock purchased by the decedent in his lifetime and stock rights accruing therefrom. Exceptions to this account were filed by Lillian W. Seidel, the life tenant, who contended that she was entitled to these profits, which had been added to *corpus,* and by Louise Plews, a remainderman, who resisted this contention of the life tenant, asserting, among other things, that the securities held by the trust did not have the values stated by the trustee; that the properties mortgaged were not worth the face of the mortgages held by the trust; that the trustee either was or soon would be the owner of the mortgaged property; and that at fair market prices the *corpus* of the trust did not exceed $216,000. That the purpose of these exceptions by the remainderman was to resist the claim of the life tenant and not to surcharge the trustee was made clear in colloquy between counsel at the hearing on the exceptions. It is significant, moreover, that the inquiry of the remainderman into the value of the property covered by the mortgages was objected to by counsel for the trustee "on the ground that no loss has been established by the estate; there is no evidence that the interest on the obligation is in default; it is not a proper subject of testimony to be received at this time," and the objection was sustained by the court. On December 24, 1932, the Orphans' Court entered its decree sustaining in part the life tenant's claim, but dismissing all exceptions filed by Louise Plews as remainderman. In that proceeding no suspicion of any impropriety on the part of the trustee was aroused either by its disclosures or the exceptant's limited inquiry.

On May 15, 1944, the life tenant died and on February 6, 1945, the trustee filed its final account in the Orphans' Court and Louise Plews and other beneficiaries filed exceptions thereto. These exceptions charged that the trustee had been guilty of self-dealing, self-interest and private profit-taking, and that it had made illegal investments and improperly managed the trust property. At the hearing on the exceptions in the Orphans' Court the preliminary question arose as to whether the exceptants would be allowed to introduce evidence of alleged wrongdoings prior to the 1932 decree. The exceptants contended that the earlier decree should be opened to permit such evidence, whereas the trustee contended that the doctrines of *res judicata,* estoppel and acquiescence should be invoked to preclude it. After taking testimony the court expressed the opinion that the circumstances did not warrant the application of the doctrines advanced by the trustee and ruled that evidence of occurrences prior to the 1932 decree would be admitted.

The exceptants thereupon proceeded to give evidence to prove the trustee guilty of numerous acts of self-dealing, self-interest and private profit-taking antedating the 1932 account, of which the trustee had made no disclosure and of which the exceptants had no knowledge until the time of this proceeding. The following transactions are illustrative:

(1) In each instance in which mortgages were made to the accountant as trustee, one of the conditions of the advancement of the money for a loan or for the purchase of a mortgage was that the borrower obtain a title policy from the trustee in its individual capacity. While this policy was paid for by the mortgagor and not out of the funds of the trust estate, it was not without profit to the trustee. The plaintiff in fact maintained no title plant of its own, nor did it make any examination or search of the records preparatory to the issuance of title insurance. Instead, what it did was to secure reinsurance from the Commonwealth Title Company, predicated on which it issued its own title policy. For this reinsurance it paid Commonwealth Title Company up to fifty per

cent of the premium charged the mortgagor for title insurance and up to seventy-five per cent of the charge for a search, keeping the balance for itself. The value of such policies is open to serious question, for in the event of a loss the trustee might be called upon to sue itself in its individual capacity. Not only did this course of action pursued by the trustee result in its making a profit out of the management of the trust estate, unknown to the court or the beneficiaries and in addition to that which it might be allowed by way of commissions, but also it placed the trustee in a position where its loyalty was divided, its interest as insurer being hostile to its interest as mortgagee-trustee.

(2) On more than one occasion mortgages which the trustee held in its individual capacity were sold to the trust estate without any appraisal being made either of the security or of the financial responsibility of the borrower at the time of the transfer.

(3) Several of the mortgages which the trustee transferred from its individually owned "mortgage pool" to the trust estate exceeded the maximum percentage of appraised value of the property as set by statute as well as the maximum which the trustee had fixed as the limit for its own individual holdings and which were doubtless known to the decedent as a director of the plaintiff for many years.

(4) In some instances mortgages transferred by the trustee from itself individually to itself as trustee were not accomplished by formal deed of assignment, subsequently recorded so as to show irrefutable and uncontrovertible title in the trust estate, but by merely noting the transfer on a card in its own files. Although this procedure might have suited the accountant's convenience, its dangers are readily apparent when it is borne in mind that the trustee individually was in the business of investing in mortgages for its own profit. Where a corporate fiduciary owns a "mortgage pool" from which it sells to itself as trustee, keeping the balance for itself individually, it inevitably and justifiably invites suspicion, especially where there are no assignments made and recorded.

(5) One group of mortgages totaling $89,500 arose out of a transaction directly beneficial to the trustee individually. Wesley Caskey, the owner of a washing machine company, had borrowed $30,000 from the trustee individually, the loan being secured by bailment leases on washing machines supposedly sold to customers. It developed that many of these leases were worthless, having been forged by an employee of the washing machine company. In order to assure the repayment of this loan together with loans to the other banks, Caskey transferred a number of properties, encumbered by an $85,000 mortgage, to Charles Krumrine, an officer of the trustee. Krumrine then negotiated to the trustee in its individual capacity his personal bond for $85,000, the money being used to pay off the outstanding mortgages on the properties. Thereupon the properties were sold to John Ross, whose purchase was made possible by a mortgage loan of $89,000 from the assets of the trust estate. As a result of the sale, the obligation of Krumrine to the trustee individually was paid off and the indebtedness of the washing machine company to it was liquidated. It is pertinent to observe that this loan of the funds of the trust estate was approved on the same day as application therefor was made, prior to any appraisal of the properties, without any inquiry as to Ross' financial responsibility and despite the fact that the purchaser had no personal funds invested in the property, the entire price being raised by mortgage loan. This transaction, moreover, resulted in a profit of $653.75 to the trustee individually from the issuance of title insurance and $208.84 from unearned interest charges. Only four years later the properties were all described in an appraisal made for the plaintiff as being in "poor condition" or "very poor condition" and their appraised value had depreciated from $130,000 to $73,900.

(6) One mortgage in the principal sum of $9,000, originally taken by the trustee in its individual capacity, was sold on June 8, 1925, to the trust estate without any appraisal of the value of the security at either time. This mortgage fell due by its terms on February 28, 1926, but was not paid nor

was payment demanded by the trustee. It was kept in the trust estate without any investigation as to its actual worth until September 6, 1929, when the mortgaged property was valued at $13,500 and its condition described as "good." Yet only three years later, in October, 1932, the building was condemned and ordered removed by the municipal authorities of Philadelphia. The appraisal of the ground value alone in 1929 was only $5,400. Although all of these facts were known to the trustee prior to the entry of the 1932 decree it made no disclosure of them, but on the contrary resisted the attempt of the beneficiaries to inquire into the true situation.

(7) In 1923 a mortgage loan in the amount of $5,000 was made by the trustee out of trust funds to T. Justus Conley, one of its employees, even though the property covered by the mortgage securing the loan was valued at only $5,750. Thus, based on its own figures, this mortgage made by the trustee to one within its own organization exceeded eighty per cent of the appraised value of the property in violation of *R. S.* 3:16–1(g).

(8) In several instances when mortgages were taken by the trustee for the estate, adjusted interest charges were made by it against the estate for the period between the execution of the mortgage and the purchase of them by it for the estate without any evidence to indicate that funds belonging to the trustee individually had actually been used.

(9) One mortgage taken by the trustee individually as security for a $10,000 loan was first assigned by it to another trust of which it was trustee. Subsequently in 1926 a transfer was made to this trust. The transfer of the title policy, however, preceded the transfer of the mortgage itself by over a month, for what reason it does not appear. This mortgage became due on March 25, 1928, but was not paid and on December 4, 1929, payment was extended by the plaintiff to September 25, 1932. On the extended due date there was a default in payment of both principal and interest, the 1931 taxes had not been paid and the obligor on the bond had died. Despite the fact that all this occurred prior to the entry of

the 1932 decree, the trustee made no disclosure of this state of affairs in its intermediate account.

(10) With respect to a number of other mortgages the trustee similarly failed to disclose at the time of its intermediate account that principal and interest were in default, or that the security was otherwise impaired. Indeed, not only did it conceal the information which it possessed but it resisted the attempt of the then exceptants to inquire into the facts on the very ground that there was no evidence that the mortgages were in default.

The foregoing incidents demonstrate conclusively that the trustee was guilty of self-interest, self-dealing, private profit-taking and flagrant mismanagement prior to the time of the intermediate account, all of which it successfully concealed from the court and the exceptants. But such breaches of its fiduciary duties were not limited to the period preceding the 1932 decree. Its conduct thereafter followed the same general pattern. The record reveals that despite the numerous defaults on mortgages held by the trust estate and the considerable losses suffered thereby, no action was taken against the obligors on the bonds; interest rates were drastically reduced to the benefit of mortgagors; owners of mortgaged properties and a second mortgagee were permitted to remain in, and take possession of the mortgaged premises and keep the income therefrom. On one occasion, in order to accommodate a mortgagor, the trustee even went so far as to foreclose its mortgage thereby wiping out an outstanding second mortgage, only to redeed the property to the mortgagor for the exact amount of the mortgage which had been foreclosed. On another occasion it never demanded payment in full of a $5,000 mortgage which became due in 1924, the only written request for payment being made in 1936 when it called for payment of $1,000 on account, even though the property just four years previously had been appraised for it at only $3,450.

After the completion of the hearings at which this overwhelming proof of the trustee's wrongdoing was elicited, the cause was transferred to the Court of Chancery by consent

of all the parties. On July 15, 1948, the court filed its conclusions which were supplemented on September 10, 1948. By virtue of the new constitution, the case was transferred on September 15, 1948, to the Chancery Division of the Superior Court, where on May 14, 1949, conclusions as to the form of judgment were filed. Final judgment surcharging the trustee and granting allowances to counsel for the exceptants, payable by the trustee in its individual capacity, was entered on June 10, 1949.

The trustee appealed from the entire judgment entered in the Chancery Division and a cross-appeal from a minor portion thereof was taken by certain of the exceptants. The Appellate Division of the Superior Court, after full consideration of all aspects of the case, upheld the action of the trial court in opening the 1932 decree and confirmed its power to grant counsel fees, *Rule* 3 :54–7 notwithstanding, but modified the judgment appealed from in certain respects, resulting in a reduction of the amount of the surcharge from an estimated $327,981.75 to approximately $220,000 and of the amount of fees and allowances to counsel by $17,250, and ordered the cause remanded to the Chancery Division for further proceedings. The trustee then petitioned this court for certification to review the propriety of permitting the 1932 decree to be reopened and of allowing an award of counsel fees despite the provisions of *Rule* 3 :54–7, and its petition was granted. The exceptants opposed the granting of the trustee's petition, but did not themselves petition for certification.

## I.

The courts below both found, and we concur in their findings, that the trustee was guilty of self-dealing, self-interest, private profit-taking and related wrongdoing prior to the entry of the 1932 decree and that the proceedings on the intermediate account neither dealt with such misconduct nor put the exceptants on notice thereof. Only during the course of the present proceedings on the final account was the trustee's wrongdoing brought to light. The first question

presented on this appeal, therefore, is whether or not in such circumstances the decree entered on the intermediate account operates to bar the exceptants from surcharging the trustee for misconduct occurring prior thereto. We are of the opinion that it does not.

We recognize that "it is a doctrine of universal acceptation that the judgment of a competent court acting within its jurisdiction is conclusive upon parties and privies as to all matters adjudged upon which the parties were of right entitled to be heard" and that this general rule applies to decrees settling accounts. *Shearman v. Cameron*, 78 *N. J. Eq.* 532, 536 (*E. & A.* 1911). But the courts have recognized exceptions to this rule in cases where there is fraud or mistake, see *Pollack v. Bowman*, 139 *N. J. Eq.* 47, 51 (*E. & A.* 1946), and it is also so provided by statute, *R. S.* 3:10–18. A trustee, as a fiduciary, is under a duty to make full and complete disclosure of all transactions in relation to his trust. He is permitted neither to conceal nor to misrepresent, and if he fails in his duty to disclose the true facts so as to give notice to interested parties of any illegal or improper investments, it amounts to fraud such as will permit a decree approving his account to be opened. "If the trustee has been guilty of fraud by way of concealment or misrepresentation in presenting his account and procuring the approval of the court, the settlement may be opened," 4 *Bogert, Trusts and Trustees* (1935) 2844.

It takes no argument to justify the proposition that a trustee in the administration of his trust is not permitted to place himself in a position where it would be to his own benefit and advantage to violate his duty to the beneficiaries of the trust. The rule is well settled, *McAllister v. McAllister*, 120 *N. J. Eq.* 407, 411 (*Ch.* 1936); affirmed, 121 *N. J. Eq.* 264 and 265 (*E. & A.* 1937). "The policy of equity is to remove every possible *temptation* from the trustee," 3 *Pomeroy, Equity Jurisprudence* (5th *Ed.*) 807. As stated by the court in *Shanley v. Fidelity Union Trust Co.*, 108 *N. J. Eq.* 564, 565 (*Ch.* 1927):

"They are our trustee and the law demands of trustees the utmost fidelity. It does not tolerate personal dealing with the trust estate nor permit the making of a penny's profit. The rule is grounded in sound morals and is reflected in the supplicating words of the Lord's prayer, 'Lead us not into temptation.'"

The trustee in the instant case not only violated its duties by self-dealing, self-interest and private profit-taking, as hereinbefore illustrated, but it compounded its breach by failing to make that disclosure of facts from which the nature of its acts could be ascertained. By so doing it is guilty of such fraud as to prevent it from relying on the decree so surreptitiously obtained to the detriment of those to whom its duties are owed. Only after confession may a trustee acquire repose.

Nor is it novel in this State to deny a trustee the protection of a decree, if facts as to its self-dealing are not disclosed, *In re Shaw*, 122 *N. J. Eq.* 537 (*Prerog.* 1937) ; *In re Oathout*, 25 *N. J. Misc.* 187 (*Essex Co. Orphans' Ct.* 1947) ; see also *Rothenberg v. Franklin Washington Trust Co.*, 129 *N. J. Eq.* 361, 362 (*E. & A.* 1941). And the weight of authority in other states is in accord with this view, 1 *A. L. R.* (2d) 1060 ; 137 *A. L. R.* 558 ; 132 *A. L. R.* 1522.

The trustee here contends that the decisions in *Pollack v. Bowman, supra,* 139 *N. J. Eq.* 47 (*E. & A.* 1946) and *Dickerson v. Camden Trust Co.*, 1 *N. J.* 459 (*Sup. Ct.* 1949), are contrary to the determinations below and bar the reopening of the 1932 decree. We cannot subscribe to this contention. In neither of these cases was there any concealment of self-dealing, self-interest or private profit-taking. The *Pollack* case specifically recognized that "fraud, mistake, injustice, or lack of jurisdiction" are exceptions to the general rule. The court there, moreover, referred to the case of *In re Shaw, supra,* 122 *N. J. Eq.* 537 (*Prerog.* 1937), but instead of overruling it, distinguished it on the facts and thereby tacitly approved it. There is nothing in the *Dickerson* case to even suggest that the exceptions recognized in the *Pollack* case are not valid and subsisting.

The argument is also advanced by the trustee that *R. S.* 3:10–18, as amended by *P. L.* 1947, *c.* 398, *p.* 1250, § 1,

renders the 1932 account conclusive and binding upon the parties and their privies. We concur, however, with the conclusion of the Appellate Division that the recent amendment to this statute can have no effect upon the finality of a decree entered before its passage. Its operation is prospective, not retrospective. We take this occasion to note, however, that the amendment in question was passed by the Legislature shortly after the decision in the *Pollack case,* and apparently represents a partial codification of the holding in that case. This being so and the statute specifically providing that a decree may be opened for fraud or mistake, it does not appear that the decree in the instant case would be free from attack even if the statute antedated it.

█ █ In addition to its contention that the 1932 decree is *res judicata* as to transactions prior thereto, the trustee argues that the exceptants are now estopped by virtue of the thirteen-year delay in raising objection to the management of the trust estate and that they must be deemed to have acquiesced therein. This argument is wholly without merit. First, there is nothing to indicate that these exceptants were aware of the trustee's misconduct prior to the commencement of the proceedings on this final account. That a beneficiary is not estopped from challenging a trustee's acts or held to have acquiesced in his misdeeds in the absence of full knowledge of the facts is evidenced by the following statement to be found in *McAllister v. McAllister, supra,* 120 *N. J. Eq.* 407, 413 *(Ch.* 1936):

"In order to bind a *cestui que trust* by acquiescence in a breach of trust by the trustee, it must appear that the *cestui que trust* knew all the facts, and was apprised of his legal rights, and was under no disability to assert them. Such proof must be full and satisfactory. The *cestui que trust* must be shown, in such case to have acted freely, deliberately, and advisedly with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which is material for him to know. He cannot be held to have recognized the validity

of a particular investment unless the question as to such validity appears to have come before him." (Quoting from *White v. Sherman*, 168 *Ill.* 589, 48 *N. E.* 128, 132.)

For similar expressions on the subject see *Blauvelt v. Citizen's Trust Co.,* 3 *N. J.* 545 (*Sup. Ct.* 1950) ; *Scheel v. Jacobson,* 112 *N. J. Eq.* 265 (*E. & A.* 1933) ; and *Giehrach v. Rupp,* 112 *N. J. Eq.* 296 (*E. & A.* 1933). In the last case the court said (at *p.* 302) :

"It is a well settled rule in equity that in cases of fraud the time limited within which the action must be brought will not commence to run until the discovery of the fraud, or until the complainant was in a situation where, by the exercise of reasonable diligence, he would have discovered the fraud."

Second, no estoppel can arise in favor of any party by reason of his own wrongful act, *Howard v. West Jersey R. R. Co.,* 102 *N. J. Eq.* 517 (*Ch.* 1928) ; affirmed, 104 *N. J. Eq.* 201 (*E. & A.* 1929). See also *Forman v. Grant Lunch Corp.,* 113 *N. J. Eq.* 175 (*E. & A.* 1933) ; *Teas v. Third National Bank & Trust Co.,* 125 *N. J. Eq.* 224 (*E. & A.* 1939).

## II.

The second question presented on this appeal is whether or not the trial court was within its power in awarding allowances and counsel fees to attorneys for the exceptants, chargeable against the trustee in its individual capacity. The Appellate Division recognized that '*Rule* 3 :54–7 does not permit the allowance of fees in cases such as this, but considered that the rule should not be applied since the cause had arisen and been substantially completed prior to the effective date of the rule. The trial court went further; it expressed the view, which the exceptants also urge upon us here, that the rule is not applicable to the Chancery Division of the Superior Court since it has the same jurisdiction to award counsel fees as did the former Court of Chancery, the contention being

that the power is inherent in a court having jurisdiction over trusts and trustees and is not derived from statute or rule. We cannot accede to these arguments.

Article XI, Section IV, paragraph 3, of the Constitution of 1947 provides that the "jurisdiction, functions, powers, and duties" of the Court of Chancery be "transferred to and divided between the new Supreme Court and the Superior Court according as jurisdiction is vested in each of them under this Constitution." Since Article VI, Section II, paragraph 3, vested the Supreme Court with jurisdiction to "make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts," it necessarily follows that the power of the former Court of Chancery with respect to practice and procedure passed to this court and not to the Superior Court and *Rule* 3:54–7(d) explicitly provides that "the authority, heretofore vested in the Court of Chancery for the granting of counsel fees in causes generally, is hereby superseded." The jurisdiction of this court in the field of practice and procedure is not to be emaciated by specious arguments that it is in part vested in the Superior Court or any other court by virtue of the fact that they succeeded to the general jurisdiction of certain of the former courts that possessed the rule-making power. The vesting of the rule-making power in this court is exclusive and of necessity operates to exclude such power from the jurisdiction of the lower courts, *John S. Westervell's Sons v. Regency, Inc.,* 3 *N. J.* 473 (*Sup. Ct.* 1950). It is said by the exceptants that we held otherwise in *Dickerson v. Camden Trust Co., supra,* 1 *N. J.* 459 (*Sup. Ct.* 1950), by there recognizing the power of the court below to grant allowances in cases such as this. The facts there were otherwise, however, for the decree under review in that case was not a judgment of the Chancery Division of the Superior Court entered subsequent to the effective date of the Judicial Article of the Constitution of 1947 and the rules of this court, but was a decree of the former Court of Chancery rendered prior thereto.

■ The contention that counsel fees should be permitted for such of the services in the cause as were rendered prior to September 15, 1948, has previously been considered by this court in *John S. Westervelt's Sons v. Regency, Inc., supra,* 3 *N. J.* 473 *(Sup. Ct.* 1950). We there said (at *p.* 479) :

"* * * the incidents of a judgment are ordinarily governed by the state of the law at the time of the entry of the judgment. The taxation of costs is essentially procedural, generally. affecting the remedy only. This principle also disposes of appellant's further contention that they are entitled to counsel fees for services rendered prior to the effective date of the Judicial. Article of the Constitution of 1947."

This case is, therefore, dispositive of the exceptants' contention here on the question of counsel fees. In *Rule* 3 :54–7 this court has specifically enumerated the types of actions in which allowances to counsel may be made, and the discretion of the trial court is limited to the granting or denying of allowances in such actions. It was not contemplated that the rule would or could be completely dispensed with in individual cases under the provisions of *Rule* 3 :1–2.

## III.

In addition to answering the arguments of the trustee, the exceptants in their brief on this appeal raised additional questions which they ask this court to adjudicate. The original judgment entered in the Chancery Division surcharged the trustee with an investment in a mortgage participation certificate, a mortgage, and certain traction stocks. In addition the trial court granted a surcharge as to income items based upon the amount of income actually received by the trustee but in no event at a rate of simple interest less than four per cent per annum on each investment for the entire period during which each investment was held. It further determined that all credits asked by the trustee for expenses and outlays concerning the illegal investments should be disallowed and the trustee was surcharged for them with simple interest at the rate of four per cent per annum computed from

the dates when each expenditure was made. The Appellate Division modified the judgment appealed from by eliminating the surcharges based on the mortgage participation certificate, the mortgage, and the traction stocks and by permitting the trustee to take credit for expenses and outlays on the illegal investments. In all other respects it approved the action of the trial court. The exceptants here ask us to reverse the judgment of the Appellate Division insofar as it modified the original judgment to their detriment and also to reverse the judgment below insofar as it directed that the income surcharge be computed on the basis of the entire period of the accounting, thereby permitting the trustee to average its gains against its losses, rather than on the basis of semi-annual or annual separate income periods, which would restrict the trustee to averaging only within a period.

These questions, however, are not properly before us. A party may not, following the granting of his opponent's petition for certification, attack the judgment under review without himself having successfully petitioned for certification. If he is to have this court review the action of the court below insofar as it is adverse to him, he must follow the same procedure as if his adversary had taken an appeal as of right. Just as there he must take a cross-appeal, so here he must make a cross-petition for certification and succeed on his application. This is the procedure contemplated and provided for by the rules and it has been recognized as a matter of practice. *Hopler v. Hill City Coal & Lumber Co.*, 5 *N. J.* 466 (*Sup. Ct.* 1950). Indeed, it would not be reasonable to provide otherwise and thereby give a respondent on an appeal following certification greater rights than a respondent on an appeal taken as of right. Since the exceptants herein did not petition this court for certification to review the decision of the court below insofar as it was adverse to them, they may not here attack that judgment and we need not adjudicate the questions they now seek to raise.

The judgment below is reversed with respect to the award of counsel fees and other allowances to the attorneys of the

exceptants, affirmed in all other respects, and the cause is remanded to the Chancery Division of the Superior Court for further proceedings in accordance with this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING and ACKERSON—5.

*For reversal*—Justices CASE and WACHENFELD—2.