17 N.J. Super. 598 (1951)
86 A.2d 606
HARRY BEHRMAN, JOHN J. HALL, ALOYSIUS J. O'BRIEN, AMOS H. RADCLIFFE AND CHARLES H. ROEMER, TRUSTEES UNDER A TRUST AGREEMENT DATED DECEMBER 26, 1934, BETWEEN THEM AND THE FRANKLIN TRUST COMPANY OF PATERSON, PLAINTIFFS,
v.
JOHN J. EGAN AND GEORGE LENDRIM, AS REPRESENTATIVES OF THE HOLDERS OF CLASS "A" CERTIFICATES; AND WILLIAM E. BROWNE AND MOSES I. FULD, AS REPRESENTATIVES OF THE HOLDERS OF CLASS "B" CERTIFICATES, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 28, 1951.
*602 Messrs. Randal B. Lewis, Walter D. Van Riper and William W. Evans, attorneys for the plaintiffs.
Mr. Walter J. Hunziker, attorney for defendants Egan and Lendrim.
Mr. Vincent C. Duffy, attorney for defendants Browne and Fuld.
Messrs. Herman H. Singer and Albert S. Gross, attorneys for estates of James R. O'Dea, et als.
Mr. George F. Miller, attorney for estate of Joseph Teshon, et al.
Messrs. Frankel & Frankel, attorneys for intervenor Nathan Metzger.
GRIMSHAW, J.S.C.
In March of 1933, following a presidential proclamation declaring a "bank holiday," the Franklin *603 Trust Company of Paterson, in company with the other banking institutions of the country, suspended business operations. When the "holiday" ended, the trust company resumed operations on a severely restricted basis. This restricted operation continued until January 15, 1935. Then, after a plan of reorganization had been approved by the Commissioner of Banking and Insurance, the stockholders and the depositors of record when the bank closed in 1933, the bank resumed normal operations.
Under the terms of the plan of reorganization, a contract was executed on December 26, 1934, between the trust company and Harry Behrman, Charles A. Bergen, Hugo Huettig, Amos H. Radcliffe and Charles H. Roemer.

* * * * * * *
The trustees named in the contract were the directors of the bank. Since the execution of the trust indenture Charles A. Bergen and Hugo Huettig have died. Their places have been taken by Aloysius J. O'Brien and John J. Hall, both of whom are directors of the trust company. Amos H. Radcliffe has died since the filing of the complaint herein. His place has not been filled.
On January 15, 1935, in accordance with the provisions of the trust agreement, there were turned over to the trustees, notes, mortgages, securities and real property, having a book value of $1,598,059.63. In addition, the trustees received the entire capital stock of the trust company which had a book value of $181,635.03. The trustees also took over the entire capital stock of Benlin Securities Company, a real estate and securities holding company which had been formed in 1931 by the bank directors. This stock had no value since at the time of the transfer its liabilities exceeded its assets by $18,554.70.
Against these assets the trustees issued 3,315 Class "A" certificates in the amount of $1,444,469.32, representing 80 per cent of the deposits frozen when the bank was closed. Also issued were 229 Class "B" certificates to the holders of the 1,000 shares of the capital stock of the bank.
*604 On April 11, 1949, the trustees filed a complaint in this court seeking approval of the account of their administration of the trust estate. Also sought was judicial approval of a plan for the distribution of the stock of the trust company, held in the trust estate. This plan which was at variance with the provisions of the trust indenture was abandoned during the course of the hearings. And the trustees now propose the disposition of the remaining assets, including the stock, at public auction as provided by the trust agreement.
Upon the filing of the complaint the plaintiffs sought and obtained an order designating the named defendants as representatives of their respective classes under the authority of Rule 3:23-1, relating to class actions. Thereafter the other defendants were permitted to intervene.
The defendants complain generally against the administration of the trust estate. In particular, their attack is directed against the transfer to the trust company of the banking house and its contents; the approval by the trustees of the increase in the capital of the bank; the permitted use by debtors of the trust estate of "A" certificates as setoffs against obligations due to the trustees and the payment of legal fees.
Among the assets transferred to the trustees upon the execution of the trust indenture, were the bank building and its fixtures. These assets at that time had a book value of $395,760 for the building and $87,100 for the fixtures. Under the terms of the trust agreement the trustees were directed to lease these assets to the trust company for a term of five years at a monthly rental of $100, with an option to the trust company for a renewal for a further term of five years at the same monthly rate. The rent was merely nominal since the cost of the upkeep of the building, paid by the trustees, was in excess of $10,000 a year.
In 1939 the bank took over the fixtures for which it paid the trustees the sum of $12,000. In 1945, upon the expiration of the second five-year term, the trustees transferred the bank building to the trust company and received in return its check for $75,000.
*605 On April 8, 1946, the trustees filed a complaint seeking approval by the Court of Chancery of the transfer of the bank building to the trust company. In the same action the court's approval of the trustees' assent to an increase in the capital of the trust company was sought. Upon petition by the complainants, the vice-chancellor named two holders of Class "A" certificates as representatives of that class and two holders of Class "B" certificates as representatives of the stockholders. Thereafter a hearing was held at which testimony in support of both counts was taken. And, on April 17, 1946, the court by its decree bearing that date, indicated its approval of the action of the trustees as set forth in both counts of the complaint.
The defendants attack the 1946 proceeding and seek to reopen the decree. They charge that they had no notice of the action and, therefore, are not bound by the decree. They charge, also, that the transfer of the bank building to the Trust Company was for a grossly inadequate consideration and a fraud upon the certificate holders. And, as to the increase of capital, defendants claim that the increase in capital was in furtherance of a scheme on the part of the trustees, in their capacity as directors of the bank, to secure stock control of that institution.
The contentions of the defendants as to the effect of the 1946 litigation are unsound. The purpose of the suit was to bring to the court's attention the transfer of the real property and the proposed increase in the capital of the bank and, having done so, to seek the court's approval of the trustees' action. It would have been extremely difficult to join all of the certificate holders in the action and no useful purpose would have been served thereby. The questions presented for the court's determination affected all of the certificate holders in common and were such as could be disposed of adequately without the necessity for joining all of the certificate holders. This was clearly a class action and the courts have repeatedly recognized the propriety of having a few members of a class designated to represent the *606 entire class provided it appears that the few will fairly insure the adequate representation of all. Behrman v. Egan, 9 N.J. Super. 171 (App. Div. 1950).
The charges of fraud in the procurement of the 1946 decree were not sustained. The proposed transfer of the bank building to the trust company had been discussed with the Commissioner of Banking and Insurance who did not disapprove of the action. The directors of the bank had been urged repeatedly by the Banking Department to increase the capital of the trust company. An action, incidentally, which has resulted in a marked enhancement in the value of the stock of which the trust estate is the majority holder. These matters were all presented for the vice-chancellor's consideration in open court and resulted in the decree approving the action of the trustees.
It is suggested that the consideration of $75,000 for the transfer of the bank building was grossly inadequate. An expert called by the defendants put a value on the real property of $204,335 as of 1946. An expert called by the trustees placed the value as of 1946 at $70,000. When there is taken into consideration the fact that the building in its present state is only suitable for use as a bank and also that present valuations by experts as of a time several years past are at best unsatisfactory, it cannot be said with any degree of certainty that a consideration of $75,000 was so grossly inadequate as to shock the conscience of the court.
Point was also made of the fact that the Chancery decree required that 30 days' notice of their preemptive rights with respect to the new stock issue be given to the certificate holders. Actually the certificate holders received 14 days' notice. But the testimony was that the subscription lists were not closed and no certificate holders who desired to purchase stock was refused that right.
Assuming that the certificate holders did not receive adequate notice of the hearing of April 17, 1946, they were notified of the results of the hearing within a month thereafter. And, until 1949, no certificate holder sought to intervene *607 in the Chancery litigation or sought to review the action taken. In the absence of a showing of fraud the attack upon the Chancery decree comes too late. Pollack v. Bowman, 139 N.J. Eq. 47 (E. & A. 1945); Liberty Title & Trust Co. v. Plews, 6 N.J. 28 (1950).
While I am unable to find any legal justification for complaint at this time against the actions of the trustees in transferring the real property and in approving the increase in the capital of the trust company, the same cannot be said about the other phases of the litigation. The study of the administration of the trust estate was hampered by the attitude of the trustees. With the complaint in this cause they filed a totally inadequate account and then, in effect, sat back and challenged the defendants to discover what was wrong with it. Only after a direct order from the court was a fairly comprehensive report submitted. The excuse for failure to submit a satisfactory accounting in the first instance was that it would be very expensive. As to that, the trustees have only themselves to blame. For 16 years they have proceeded with the administration of a trust of upwards of $1,500,000 without giving any account of their stewardship. It is not surprising that now the accounting is expensive; a fact, I might remark parenthetically, which will be taken into consideration when the final orders are signed.
The trustees took the position that the defendants had the burden of sustaining the validity of their criticism of the administration of the trust. That would be true if the defendants were seeking to show that there were more assets in the estate than the trustees acknowledged. In re Perrone, 5 N.J. 514 (1950). But when, as here, the trustees are seeking credit for items of discharge, the burden is on the trustees to justify those items. Kirby v. Coles, 15 N.J.L. 441 (Sup. Ct. 1836).
The testimony offered by the plaintiffs in support of the account, with the exception of that of Mr. White, the accountant, was most unsatisfactory. In general, it was contradictory, *608 uncertain and hesitant; mostly general and seldom specific. Mr. Roemer, the only one of the original trustees who testified, gave testimony at times which, coming from one in his position, could only be characterized as extraordinary.
It is clear that the trustees treated the "A" certificates as though they were shares of stock. "A" certificates were bought on the open market at prices ranging between five and fifteen cents on the dollar. For the purpose of concealing the identity of the purchasers, the trustees used the Benlin Securities Company, which they controlled. Later, a corporation known as the Frankham Realty Company, also controlled by the trustees, was used for the same purpose. A large number of the certificates so purchased were cancelled and new certificates in smaller denominations were then issued to persons indebted to the trustees. Such persons then used the new certificates as setoffs against obligations owed to the trust estate. In the absence of circumstances justifying the acceptance of a certificate in satisfaction of a claim, as for instance the insolvency of the obligor, such setoffs are improper. Singac Trust Co. v. Totowa Lumber & Supply Co., 112 N.J.L. 99 (E. & A. 1933).
The use of dummies for the purchase of "A" certificates was clearly violative of the spirit of the trust agreement. And the issuance of fractional certificates was in conflict with the letter of the indenture which provided that certificates would be transferred only for their full amount. Under such circumstances the trustees acted at their peril and are liable for any loss to the trust estate.
The defendants challenge the acceptance by the trustees of "A" certificates as setoffs against note obligations in the amount of $166,184.05 and against a mortgage obligation of $2,958.63. Since the setoffs were items of discharge the burden was on the trustees to justify them. Save for sweeping generalizations, the trustees did not explain voluntarily any of the transactions. Such testimony as was presented was elicited from the witnesses under cross-examination.
*609 The examination disclosed, among other things, that officers of the bank were permitted to credit against obligations due the trustees the full face value of "A" certificates purchased for 15 cents or less on the dollar. The maker of a note of $7,150 offered $2,000 in cash in settlement of his obligation, together with proof of his inability to pay more. The offer was accepted. The debtor's lawyer took to the trust company cash in the sum of $2,100 and received the cancelled note. The $2,100 was not credited to the trustees' account as might be expected. Instead a certificate in the amount of $2,000, for which Mr. Jacob Paer had paid to the bank $517, was used to cancel the note of $7,150. As the record now stands, the trustees, having accepted a cash offer of $2,000 in settlement of a $7,150 obligation, actually received instead a certificate valued at $517. And that at a time when the debtor's bank account showed a credit balance of $2,000. What became of the cash payment has not yet been satisfactorily explained.
Among the assets held by the trustees was the entire capital stock of Frankham Realty Company. That company owned a factory building on George Street, in the City of Paterson. A contract was executed for the sale of this property for $91,000 to a company known as the Bensall Realty Company. When the title was closed the purchase price was arbitrarily reduced to $85,000 and, in addition, a commission of $4,300 was paid to another corporation known as Bengar Realty Co. Both Bensall Realty Company and Bengar Realty Company were controlled by a Benjamin Garfinkle. No satisfactory explanation of the arbitrary reduction of $5,000 in the purchase price of the George Street property has been offered by the trustees. Nor, it appears, did Mr. Roemer make known to the other trustees Mr. Garfinkle's connection with both corporations.
Among the assets of the trust estate was real property on Fair Street in the City of Paterson, which had been taken over by the trustees in lieu of the foreclosure of a $12,000 mortgage. In 1940 the property was sold to a corporation, *610 alleged to be controlled by Mr. Garfinkle, for a stated consideration of $12,000. Of this sum $9,714.51 was represented by "A" certificates having a face value of $9,714.51.
Many other items objected to by the defendants, remained unexplained. These, together with the transactions discussed above, have convinced me that the trustees must provide a frank, full and detailed explanation of all of the questioned items before they may receive from this court its approval of their administration of the trust estate. Failure on the part of the trustees to provide such an explanation will, of course, result in a very substantial surcharge.
In his report, the accountant stated that he had been unable to report upon the activities of the Frankham Realty Company as of the date of the accounting. Comment upon this subject, therefore, must await the coming in of the accountant's report.
The last matter upon which comment is required at this time is the subject of counsel fees. In the account submitted by the trustees, allowance is sought for $19,204.53, representing legal fees paid to Jacob Paer, and $499.75 paid to William K. Azar. When first asked concerning these fees, Mr. Roemer stated that he was in no way concerned with them nor did he receive any part of them. He stated that Mr. Paer and Mr. Azar were not connected with him in business. They only shared offices with him. Upon having his attention called to the fact that all of the checks in payment of the legal fees went through his personal account, Mr. Roemer then said that the checks were deposited in his account so that disbursements advanced by him could be deducted. Such disbursements, in the case of Paer, he said, amounted approximately to the sum of $2,000. The balance of $17,000, according to Roemer, was paid to Paer. Finally, however, it was proved to my satisfaction that Mr. Paer and Mr. Azar, respectively, were employees in the office of Mr. Roemer and received salaries for doing his work regardless of the source. The amounts paid as compensation to those two attorneys had no relationship to the work done for the *611 trustees. In other words, Mr. Roemer was receiving for his own use fees ostensibly paid to Paer and Azar.
What course the court would have pursued had a frank and open disclosure been made of the true facts, need not concern us. Such disclosure was not made. Instead a bold attempt to conceal the true situation from the court was made.
Mr. Roemer was serving as trustee under an agreement which provided that none of the trustees would receive compensation other than a reasonable attendance fee. In violation of this provision of the indenture, he took for his own the fees of $19,704.28 which nominally had been paid to Paer and Azar. In addition, he received fees from persons obligated to the trustees. Undoubtedly some of the amounts received were for disbursements. What those disbursements were, Mr. Roemer will be given an opportunity to prove. He will be surcharged for the balance. Liberty Title & Trust Co. v. Plews, supra.
In view of the fact that further information is required from the trustees, as indicated above, a final judgment may not be entered at this time.
I will hear counsel on the question of the time needed to provide the additional information.