823 A.2d 1

IN THE MATTER OF THE TRUST CREATED MARCH
31, 1992, BETWEEN LAURA J. NILES, GRANTOR,
AND GEOFFREY M. PARKINSON, TRUSTEE.

TRUST CREATED MARCH 31, 1992, BETWEEN LAURA J. NILES,
GRANTOR, AND GEOFFREY M. PARKINSON, TRUSTEE;
AND,TRUST CREATED AUGUST 23, 1994, BETWEEN LAURA J.
NILES, GRANTOR, AND GEOFFREY M. PARKINSON, TRUST-
EE.

Argued March 17, 2003—Decided May 28, 2003.

*John A. Ridley,* argued the cause for appellants, The Laura J. Niles Foundation, Inc. and Geoffrey M. Parkinson (*Drinker Bid-*

*dle & Shanley,* attorneys; *Bruce L. Shapiro, Edward A. Gramigna, Jr., Megan J. Harris* and *Michael G. Langan,* on the briefs).

*Jonathan C. Scott,* a member of the New York bar, argued the cause for respondent, Salvatore A. Bono (*Murray & Kimball,* attorneys; *Mr. Scott* and *William J. Murray,* on the briefs).

*Joseph P. Castiglia,* argued the cause for respondent, Serena Niles.

The opinion of the Court was delivered by

COLEMAN, J.

■ In this appeal a mother and her son working as a team unduly influenced an eighty-eight-year-old, single, demented multimillionairess to modify three *inter vivos* trust agreements to name the son as trustee and to confer upon them substantial economic benefits under the altered trust agreements. The former trustee and the primary residuary beneficiary under the former trust agreements successfully prosecuted litigation to remove the illegitimate trustee and to require the mother-son team to make the estate whole except for certain counsel fees. The issue raised in this appeal is whether to create an exception, if one does not exist already, to the American Rule, which generally does not permit a prevailing party to recover counsel fees from a losing party. We hold that when, as in this case, an executor or trustee reaps a substantial economic or financial benefit from undue influence, the fiduciary may be assessed counsel fees incurred by plaintiffs and third parties in litigation to restore the estate's assets to what they would have been had the undue influence not occurred. We also hold that the mother-son team should be jointly and severally liable for all reasonable counsel fees authorized by this opinion.

I.

This appeal arises out of three *inter vivos* trusts executed by Laura J. Niles (Laura) who was born on July 1, 1909. Laura never married and had no children. She had one brother, Henry

E. Niles (Henry), who was two years younger. Laura and Henry inherited a large fortune from their father's estate. In 1997, Laura's assets were in excess of $17.5 million. Laura and Henry lived together in their jointly owned family home in Brightwaters, Long Island, New York until 1986.

Geoffrey Parkinson, an investment counselor, was a long-time neighbor and friend of Laura and Henry while they resided in New York. In the 1980's, Parkinson became their financial advisor. In 1986, Laura moved into a newly acquired home in Blairstown, New Jersey and pursued a hobby of breeding show dogs. Henry, however, remained at the Brightwaters home because of declining physical and mental health. A friend of Laura, and a client of Parkinson, asked Serena Bono (Serena) to check on Henry periodically. Although Henry was thirty years older than Serena, between 1986 and 1989 they developed a close personal relationship. When Laura first met Serena in 1986, she was not fond of her. Indeed, Laura regarded Serena as a "con artist" and believed that Serena wanted to marry Henry for his money.

By 1990, Henry's health had declined to the point that he was unable to handle his personal and financial affairs. Henry's poor health prompted Parkinson and Leland Selby, Henry's New York attorney, to institute voluntary conservatorship proceedings in New York on Henry's behalf with Laura's approval. After those proceedings were commenced, Parkinson and Selby learned that Henry and Serena were considering marriage. Although Selby obtained a restraining order in April 1991 prohibiting the marriage, the couple nevertheless married on November 4, 1992. Despite Henry's refusal to participate voluntarily in the conservatorship proceedings after the marriage, Joseph J. Kunzeman, a former judge, was appointed conservator of Henry's property and Parkinson was continued as Henry's financial advisor. Kunzeman initiated annulment proceedings that were withdrawn when Serena entered into a post-nuptial agreement that would provide her $250,000 per year for every year she remained married to Henry

and a $1 million bonus if she remained married to Henry for five years. Henry died December 27, 1997, leaving no children.

On March 31, 1992, Laura created the first two of the three *inter vivos* trusts: (1) a revocable trust into which Laura placed most of her assets and which designated the Laura J. Niles Foundation, Inc. (Foundation) as her residuary beneficiary, and (2) a charitable remainder unitrust with Laura as grantor and settlor (CRUT I) into which Laura placed a small portion of her assets to generate income and tax savings. On her death, any money remaining in the trust would be paid to Henry and at his death the principal and income of the CRUT I would go to the Foundation. The third trust was created on August 23, 1994, when Laura established a second charitable remainder unitrust (CRUT II) designed to yield her a higher income from the corpus. Parkinson was named as trustee of all three trusts and he served in that capacity until Laura was unduly influenced to execute new estate and trust instruments on May 21, 1997, that modified the original trust agreements.

As early as 1994, Laura was suffering from a variety of medical problems, including dementia. Although initially not necessary, on the advice of her treating physician, Laura obtained daily in-home nursing care from 8:00 a.m. to 11:00 p.m. Laura's organic brain condition continued to deteriorate and she suffered a moderately severe stroke in September 1997. Thereafter, she required twenty-four hour nursing care.

After Serena and Henry were married in 1992, Laura and Serena began spending more time together. Serena began pressuring Laura to purchase a condominium in Naples, Florida for use by Serena, Henry, Laura and other family members. A condominium was purchased in Naples in late 1995. Thereafter, Laura began to spend more and more time with Serena and her son Salvatore Bono (Bono) in Florida, New Jersey, and New York. By 1997, Laura allegedly began to voice dissatisfaction with Parkinson's handling of her financial affairs. In response, Bono recommended the New York law firm of Fischbein, Badillo, with

which he had a prior relationship, to review her trust documents. On May 21, 1997, Laura amended her will and modified the trust agreements. Notably, Bono became executor of Laura's will and he also replaced Parkinson as trustee under the three trust agreements. Laura believed that Bono was qualified to be her trustee because he was a "very, very smart" "insurance executive," involved in "high finances, mergers, and acquisitions." In truth, Bono had graduated from college in 1988 and had spent his nascent professional life collecting residential rents for a landlord/pizzeria owner and attempting to get his insurance brokerage firm, Bonocorp Insurance Brokerage, off the ground. Significantly, the changes in Laura's will and trust agreements heavily favored the Bono family, including a bequest of Laura's interest in the $700,000 Florida condominium to Serena; $125,000 to each of Bono's four children to be held in trust for them with Bono as trustee; Laura's Blairstown home and a trust in the amount of $800,000 for Gregory Drejka and Romana Baranska, Laura's household staff; and a reduction from $500,000 each to $100,000 each in a bequest to the two children of Laura's beloved goddaughter.

With his newfound power, Bono embarked on a sixteen-month looting spree of Laura's estate. Working as a team, Serena and Bono used Laura's trust accounts, checkbook, signature stamp, cash, and credit cards for their profligate spending habits. Those expenditures included a $75,000 Mercedes Benz sedan; a $20,000 Cartier watch that was ostensibly a Christmas gift from Laura to Henry (who was so ill that he died two days later on December 27, 1997); and thousands of dollars at various department stores, specialty shops, and boutiques.

After Bono had been acting as Laura's fiduciary for approximately eight months, Parkinson filed a verified complaint and accounting on January 20, 1998, seeking the following relief: (1) an allowance of the settlement of his account as the former trustee; (2) an allowance for investment advisory fees; and (3) the appointment of a guardian *ad litem* (GAL) for Laura because

Bono and Serena unduly had influenced her into changing her will and trust agreements. The trial court issued an order to show cause with respect to the accounting, appointed Michael S. Selvaggi, Esq. as Laura's GAL, and ordered Selvaggi to investigate the claim of undue influence. After a comprehensive investigation, the GAL recommended that the trial court conduct a plenary hearing on the undue influence issue; that Parkinson's accounting should be accepted as submitted; and that Selvaggi remain as Laura's GAL. In response, the trial court implemented those recommendations and also ordered Bono to file a formal accounting detailing his services as trustee from the date of his appointment to the present.

On July 31, 1998, Bono filed his accounting with the trial court. A month later, Parkinson filed exceptions to Bono's accounting and sought to remove Bono as trustee and to surcharge him for improper expenditures. At about the same time in August 1998, Laura slipped into a coma from which she never recovered before her death on February 8, 2000. On September 18, 1998, the trial court temporarily removed Bono pending a final determination on the merits. Subsequently, on January 19, 1999, the Foundation filed a verified complaint seeking a determination that Bono and Serena unduly had influenced Laura to execute the trust documents to their benefit. The complaints filed by Parkinson and the Foundation were consolidated for trial.

The Chancery Division, Probate Part, bifurcated the issues into two separate bench trials. The first, which took place over seven days, focused on Bono's accounting and whether he should be removed as trustee. At its conclusion on August 3, 1999, the trial court permanently removed Bono as trustee based on *N.J.S.A.* 3B:14–21c, finding that his conduct was "inexcusable and reprehensible" because he had embezzled and misused Laura's assets. The trial court rejected his accounting and directed him to pay surcharges to Laura's estate in the amount of $361,800 for his breach of fiduciary duty as trustee. The court also ruled that the request for additional surcharges would have to await the trial on

undue influence. The second bench trial, which took place over thirteen days, addressed the allegations of undue influence. At its conclusion on January 10, 2000, the trial court found "that there is no clearer case of undue influence than the one presently before this court." As such, the amendments to Laura's will and powers of attorney, and all modifications to the trust documents, were declared to be "null and void" because they resulted from the undue influence of Bono and Serena. The trial court reinstated Laura's will and trusts that existed prior to their May 21, 1997 modifications and restored Parkinson as trustee. Lastly, the trial court authorized Parkinson and the Foundation to file an application for additional surcharges, including counsel fees, against Bono and Serena, based on the court's finding of undue influence.

Parkinson and the Foundation then sought reimbursement of counsel fees incurred by the estate in connection with the litigation and various compensatory damages in the sum of $2,987,106, representing $2,199,077 in counsel fees and $788,029 in compensatory damages. On March 24, 2000, the trial court granted in part and denied in part the application. The court surcharged Bono individually for counsel fees in the amount of $471,451 for representation provided Bono by three law firms, and compensatory damages in the amount of $334,276 for a total of $805,727; Serena individually for counsel fees of $162,014; Bono and Serena jointly and severally for counsel fees in the amount of $314,282 as well as $50,000 in compensatory damages, for a total of $364,282. The total damages awarded to Parkinson and the Foundation were $1,332,023.

The trial court, however, denied that part of the application that sought reimbursement for the counsel fees charged to the estate by the Foundation, Parkinson, and the other parties in the case. In so ruling, the court noted that under *In re Alleged Will of Landsman*, 319 *N.J.Super.* 252, 725 *A.*2d 90 (App.Div.), *certif. denied*, 161 *N.J.* 335, 736 *A.*2d 528 (1999), it was "authorized to compel [Bono] and [Serena] to pay their own legal fees, because it would be inequitable for the court to conclude that the estate

should have to pay the legal fees for the individuals who unduly influenced." On the other hand, the trial court declined to award the counsel fees of the plaintiffs and other parties to the litigation because it did not "find any basis in *Landsman* to shift the attorney's fees from the other parties to ... Bono and [Serena]." Bono and Serena appealed and the Foundation and Parkinson cross-appealed.

The Appellate Division in an unpublished opinion affirmed the trial court's finding of undue influence by Bono and Serena "and the imposition of fees, costs and surcharges against Serena and [Bono]." The panel also concluded that "the exercise by Serena of undue influence to procure the results manifested by the 1997 invalidated documents, justified imposition of a joint and several obligation upon Serena for [the specified] counsel fees on equitable principles, notwithstanding her lack of 'fiduciary' status." Finally, when addressing whether the counsel fees incurred by the Foundation, Parkinson, and the other parties should have been assessed against Bono and Serena, the panel acknowledged that the trial court had read *Landsman* too narrowly. The panel nonetheless rejected those claims for reasons unrelated to the American Rule. It disallowed the request because "[p]laintiffs' application for ... those counsel fees does not disclose precisely what services were rendered, for what purpose, and why the estate was obligated by the court to pay them."

We denied the petitions for certification filed by Serena and Bono and granted the cross-petitions filed by the Foundation and Parkinson. 174 *N.J.* 362, 807 *A.*2d 194; 174 *N.J.* 363, 807 *A.*2d 194 (2002).

## II.

The Foundation and Parkinson argue that because "[t]he fees at issue here were the direct and proximate result of the extensive litigation required to right the wrongs perpetrated by [Bono and Serena]," they should be liable for all fees and expenses caused by their defalcations in order to restore the trust assets to what they

would have been had the trust been administered properly. The Foundation and Parkinson urge us to create an exception to the American Rule similar to the fee shifting in third-party tort litigation based on a breach of a fiduciary duty, *see In re Estate of Lash,* 169 *N.J.* 20, 31–32, 776 *A.*2d 765 (2001), or the fee shifting in attorney-malpractice cases, *see Packard–Bamberger & Co. v. Collier,* 167 *N.J.* 427, 444, 771 *A.*2d 1194 (2001); *Saffer v. Willoughby,* 143 *N.J.* 256, 272, 670 *A.*2d 527 (1996). Finally, they contend that Serena should be held jointly and severally liable for all of the damages incurred by Laura's trusts because she acted as an accomplice of Bono in exercising undue influence over Laura.

As a threshold matter, the counsel fee claims involved in this case fall into two separate categories: (1) fees assessed against Laura's estate that were incurred by Parkinson in litigation with third parties, *i.e.,* the Foundation, the minors, the household staff, and the GAL, as a result of Bono's breach of fiduciary duty; and (2) fees assessed against Laura's estate that were incurred in litigation by Bono and Serena. Only the former is involved in this appeal because Bono and Serena already have been surcharged for the counsel fees the estate paid on their behalf. Nonetheless, we must address both categories of counsel fees because each implicates a different legal theory that is essential to an understanding of our ultimate disposition. Thereafter, we must decide whether Serena should be held jointly and severally liable for any additional counsel fees awarded.

A.

■ Our analysis of whether Bono, Serena, or both of them should be required to pay additional counsel fees begins with our counsel fee Rule, *R.* 4:42–9. That Rule provides that "[n]o fee for legal services shall be allowed in the taxed cost or otherwise, except" in certain special circumstances enumerated in the Rules themselves or when such fees specifically are authorized by statute. *R.* 4:42–9a. The history of that Rule demonstrates that New Jersey has a strong policy against the shifting of counsel fees.

*Packard–Bamberger, supra,* 167 *N.J.* at 440, 771 *A.*2d 1194 (citing *North Bergen Rex Transp., Inc. v. Trailer Leasing Co.,* 158 *N.J.* 561, 569, 730 *A.*2d 843 (1999)); *Right to Choose v. Byrne,* 91 *N.J.* 287, 316, 450 *A.*2d 925 (1982); Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:42–9 (2003). This Court has embraced that policy by adopting the "American Rule," which prohibits recovery of counsel fees by the prevailing party against the losing party. *Lash, supra,* 169 *N.J.* at 30, 776 *A.*2d 765 (citation omitted); *North Bergen, supra,* 158 *N.J.* at 569, 730 *A.*2d 843 (citation omitted); *see Pressler, supra,* comment 1 on *R.* 4:42–9 (noting this Court's stalwart commitment to the American Rule). The purposes behind the American Rule are threefold: (1) unrestricted access to the courts for all persons; (2) ensuring equity by not penalizing persons for exercising their right to litigate a dispute, even if they should lose; and (3) administrative convenience. *Lash, supra,* 169 *N.J.* at 43, 776 *A.*2d 765 (Verniero & LaVecchia, JJ., dissenting) (quoting Neal H. Klausner, Note, *The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility,* 61 *N.Y.U. L.Rev.* 300, 304–05 (1986) (footnotes omitted)). Because *Rule* 4:42–9 contains no explicit exception applicable to this case and because fee shifting is "in derogation of the usual policy applied by New Jersey courts," *McGuire v. City of Jersey City,* 125 *N.J.* 310, 326, 593 *A.*2d 309 (1991), we must decide whether there is an existing exception to the American Rule that supports fee shifting under the special circumstances of this case.

As with most rules, some exceptions have been incorporated into *Rule* 4:42–9. One such exception pertinent to this case is the allowance of counsel fees where they are a " 'traditional element of damages in a particular cause of action.' " *Lash, supra,* 169 *N.J.* at 31, 776 *A.*2d 765 (quoting Pressler, *supra,* comment [2.10] on *R.* 4:42–9); *see Jugan v. Friedman,* 275 *N.J.Super.* 556, 573, 646 *A.*2d 1112 (App.Div.), *certif. denied,* 138 *N.J.* 271, 649 *A.*2d 1291 (1994). A corollary to that exception provides that " '[a] plaintiff has the right to recover attorney's fees incurred in other litigation with a third person, if he became

involved in that litigation as a result of a ... tortious act by the present defendant.'" *Lash, supra,* 169 *N.J.* at 31, 776 *A.2d* 765 (quoting 22 *Am.Jur.2d Damages* § 618 (1988)); *Jugan, supra,* 275 *N.J.Super.* at 573, 646 *A.2d* 1112 ("[I]f the commission of a tort proximately causes litigation with parties other than the tortfeasor, the plaintiff is entitled to recover damages measured by the expense of that litigation with third parties.") (citations omitted); *accord Restatement (Second) of Torts* § 914(2) (1979) ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.").

There is substantial evidence in this case that Bono committed a tort when he breached his fiduciary duty as Laura's trustee. *See Lash, supra,* 169 *N.J.* at 27, 776 *A.2d* 765 (noting that "breach of fiduciary duty is a tort") (citation omitted). Section 874 of the *Restatement (Second) of Torts* provides: "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Moreover, comment b to section 874 states: "A fiduciary who commits a breach of his duty as a fiduciary is guilty of *tortious conduct* to the person for whom he should act." *Restatement (Second) of Torts, supra,* § 874 comment b (emphasis added).

Here, Parkinson filed the initial lawsuit and was compelled to name as interested parties the Foundation, the minors, and the household staff because they were beneficiaries under Laura's estate. In addition, Laura's GAL was forced to participate in much of the litigation because of Laura's declining mental health. The counsel fees of those third parties were charged to Laura's estate. As a result of Bono's tort, the estate incurred significant damages in the form of counsel fees that were not surcharged against Bono or Serena as tortfeasors. The counsel fees incurred for representation of those third parties represent consequential damages to the estate proximately caused by Bono's breach of his fiduciary

duty. "But for" Bono's tortious conduct, the litigation that was the wellspring from which all counsel fees flowed would not have been necessary. Therefore, it follows that all counsel fees charged to the estate for representation of third parties in the litigation should be reimbursed by tortfeasor Bono. To hold otherwise would mean that Bono has shifted a substantial portion of the economic burden of his misdeeds to the victims—the beneficiaries of the trusts.

### B.

Next, we address the more difficult question of whether the estate should be reimbursed for the counsel fees it incurred for representation of the Foundation and Parkinson as plaintiffs in litigation against Bono and Serena. That claim directly implicates the American Rule because Bono and Serena were the defendants. To charge them with the counsel fees incurred by the Foundation and Parkinson as plaintiffs is tantamount to charging the losing parties with the prevailing parties' counsel fees. The question, therefore, is whether in the unique circumstances of this case an equitable remedy should be provided notwithstanding the fact that such counsel fees are not authorized by statute or *Rule* 4:42–9. The trial court found, and the Appellate Division affirmed, that Bono and Serena exercised undue influence over Laura. Undue influence is a pernicious tort that has been referred to as a "species of fraud." *Landsman, supra,* 319 *N.J.Super.* at 276, 725 *A.*2d 90. Thus, the Court must balance strong, competing policy objectives: the principles underlying the American Rule and the necessity of making victims of perfidious behavior whole.

This Court has created another exception to the American Rule when important public policy concerns are involved. In *Packard–Bamberger,* and *Saffer,* we created a specific exception in cases of attorney malpractice. Those cases permit counsel fee shifting when a plaintiff proves either attorney negligence, *Saffer, supra,* 143 *N.J.* at 272, 670 *A.*2d 527, or an intentional violation of an attorney's fiduciary duty, *Packard–Bamberger, supra,* 167 *N.J.* at

443, 771 *A.*2d 1194. In *Packard–Bamberger, supra,* we carefully circumscribed that exception to the rule by holding that a plaintiff could recover counsel fees only when "a plaintiff [could] demonstrate the existence of an attorney-client relationship." 167 *N.J.* at 443, 771 *A.*2d 1194. This Court further noted that the exception was warranted to "assure that the client be placed in as good a position as if the attorney had performed properly." *Ibid.*

 A fiduciary relationship exists between a trustee and the trust similar to the attorney-client relationship. *Restatement (Second) of Trusts* § 2 comment b (1959) (stating that "Fiduciary relations include not only the relation of trustee and beneficiary, but also, among others, those of . . . attorney and client."). Like the attorney-client relationship, a trustee's fiduciary relationship is based on the utmost trust. *See In re Koretzky's Estate,* 8 *N.J.* 506, 528, 86 *A.*2d 238 (1951) (noting that trustee's most "fundamental duty" is his duty of loyalty to trust's beneficiaries); *accord Gilliam v. Edwards,* 492 *F.Supp.* 1255, 1266 (D.N.J.1980) (stating that trustee's duty is "to administer the trust solely in interest of the beneficiaries"). Both the attorney and a trustee act as officers of the court when acting on behalf of clients and beneficiaries.

In *Lash, supra,* the administrator of an estate breached his fiduciary duty by misappropriating estate funds. 169 *N.J.* at 24, 776 *A.*2d 765. This Court held that because the administrator's breach of fiduciary duty caused the estate to file suit against the surety on the bond, the administrator was liable to the estate for counsel fees incurred. *Id.* at 28–29, 776 *A.*2d 765. Thus, the surety was liable for those counsel fees because its "liability [was] coextensive with the liability of the [administrator]." *Id.* at 30, 776 *A.*2d 765. Although the *Lash, Packard–Bamberger,* and *Saffer* trilogy has never affirmatively allowed an estate to recover counsel fees incurred in an action against a fiduciary to establish the fiduciary's liability, fee shifting in that circumstance has never been denied in an opinion of this Court. We believe this is an appropriate case in which to permit such fee shifting.

The dissent's reliance on *Liberty Title & Trust Co. v. Plews*, 6 *N.J.* 28, 77 *A.*2d 219 (1950), is misplaced. This Court held that because the New Jersey Constitution, article VI, section 2, paragraph 3, confers upon us exclusive rule-making authority with respect to practice and procedure, the Chancery Division lacked the authority to order fee-shifting not authorized by the court rules. *Liberty Title, supra,* 6 *N.J.* at 43–44, 77 *A.*2d 219. This "Court's authority to engage in rule making includes the exclusive power to establish or modify Court Rules through judicial decisions." *State v. Clark,* 162 *N.J.* 201, 205, 744 *A.*2d 109 (2000) (citations omitted). We used that authority to modify the fee-shifting rule in *Lash, Packard–Bamberger,* and *Saffer.*

Similarly, the dissent's reliance on *McGuire v. City of Jersey City,* 125 *N.J.* 310, 593 *A.*2d 309 (1991); *Satellite Gateway Communications, Inc. v. Musi Dining Car Co.,* 110 *N.J.* 280, 540 *A.*2d 1267 (1988); *Grober v. Kahn,* 47 *N.J.* 135, 219 *A.*2d 601 (1966); *Sunset Beach Amusement Corp. v. Belk,* 33 *N.J.* 162, 162 *A.*2d 834 (1960); and the dissent in *State v. Otis Elevator Co.,* 12 *N.J.* 1, 95 *A.*2d 715 (1953), also is misplaced. Those cases involved business dealings and equally sophisticated parties. In contrast, the fiduciary involved in the present case psychologically overpowered an eighty-eight-year old demented person.

■ This Court has created exceptions to the American Rule when "the interest of equity [has] demand[ed] it." *Lash, supra,* 169 *N.J.* at 43, 776 *A.*2d 765 (Verniero & LaVecchia, JJ., dissenting) (citing *Red Devil Tools v. Tip Top Brush Co.,* 50 *N.J.* 563, 575–76, 236 *A.*2d 861 (1967)). Like an attorney who commits malpractice in the form of exercising undue influence while representing a testator, settlor or an estate, a trustee of an estate who exercises undue influence over a testator intentionally has breached a fiduciary relationship in a manner at least as egregious as the administrator's intentional wrongdoing in *Lash,* or an attorney who has intentionally breached his fiduciary duty. We hold that when an executor or trustee commits the pernicious tort of undue influence, an exception to the American Rule is created that

permits the estate to be made whole by an assessment of all reasonable counsel fees against the fiduciary that were incurred by the estate.

 Undue influence generally has been defined as " 'mental, moral or physical' exertion which has destroyed the 'free agency of a testator' [or settlor] by preventing the testator [or settlor] 'from following the dictates of his own mind and will and accepting instead the domination and influence of another.' " *Haynes v. First Nat'l State Bank of New Jersey,* 87 *N.J.* 163, 176, 432 *A.*2d 890 (1981) (quoting *In re Estate of Newman,* 133 *N.J. Eq.* 532, 534, 32 *A.*2d 826 (E. & A.1943)). Undue influence committed by an executor or trustee to obtain a significant financial benefit for himself is especially pernicious regardless of whether the fiduciary is an attorney. Undue influence by an attorney who becomes executor-beneficiary under a will, and undue influence by a non-attorney who becomes trustee-beneficiary, should be treated the same regarding the payment of counsel fees required to remove the person as a fiduciary. *See generally Haynes, supra,* 87 *N.J.* at 177–83, 432 *A.*2d 890. The only difference between the two is that the lawyer used his authorization to practice law as a license to steal and the trustee, having been named to that office, used the office to do the same. It is a difference with little meaning. In both instances, the removal proceedings are based on fraud or other intentional wrongdoing perpetrated against the settlor or testator and the beneficiaries. Such fraud generally is committed against vulnerable persons such as older people with progressively disabling health conditions. Here, Laura was an eighty-eight-year-old demented person when Serena and Bono perpetrated a multi-million dollar fraud upon her and the beneficiaries of her estate.

 The new exception to the American Rule hereby created will not open the "floodgates." The exception is limited to *cases in which an executor's or a trustee's undue influence results in the development or modification of estate documents that create or expand the fiduciary's beneficial interest in the estate.* It is

based on the fiduciary's intentional misconduct regardless of his or her professional status. Moreover, undue influence, as a form of fraud, must be proven by clear and convincing evidence. *In re Davis' Will,* 14 *N.J.* 166, 169, 101 *A.*2d 521 (1953); *New Jersey Economic Dev. Auth. v. Pavonia Rest., Inc.,* 319 *N.J.Super.* 435, 445, 725 *A.*2d 1133 (App.Div.1998); *In re Will of Liebl,* 260 *N.J.Super.* 519, 527, 617 *A.*2d 266 (App.Div.1992), *certif. denied,* 133 *N.J.* 432, 627 *A.*2d 1138 (1993); *Baldasarre v. Butler,* 254 *N.J.Super.* 502, 521, 604 *A.*2d 112 (App.Div.1992), *rev'd in part on other grounds,* 132 *N.J.* 278, 625 *A.*2d 458 (1993); *Aiello v. Knoll Golf Club,* 64 *N.J.Super.* 156, 160–61, 165 *A.*2d 531 (App.Div.1960); 5 *New Jersey Practice, Wills and Administration* § 61, at 211–12 n. 2 (Alfred C. Clapp) (rev.3d ed. (1982)). Most important, the undue influence exception does not violate the purposes of the American Rule. Under our law, undue influence represents such an egregious intentional tort that it establishes a basis for punitive damages in a common law cause of action. *See* Punitive Damages Act, *N.J.S.A.* 2A:15–5.9 to –5.17. The exception we have created directly follows from the special status of the undue influence tort.

Consequently, we hold that Bono and Serena must pay the counsel fees of the Foundation, Parkinson, and the third parties to make the estate whole. Otherwise, the estate, an innocent party, will suffer damages as a result of the undue influence perpetrated by Bono and Serena. To hold otherwise would thwart the equitable principles to which the Court has always adhered.

## C.

The Foundation and Parkinson seek to hold Serena jointly and severally liable for the additional counsel fees awarded to the estate. We agree that Serena should be jointly and severally liable substantially for the reasons expressed by the Appellate Division. The panel stated that

"Serena was the driving force behind the changes Laura made to her estate plan documents in 1997 so as to benefit herself, Salvatore and their family members. Moreover, it is Serena who initiated the undermining of Parkinson by her

constant baseless comments, criticisms, and accusations of his financial treachery and dishonesty."

## III.

The judgment of the Appellate Division with respect to the two additional counsel fee issues is reversed. The matter is remanded to the Chancery Division, Probate Part, to determine the reasonable counsel fees to be awarded in accordance with this opinion.

LaVECCHIA, J., dissenting.

In this suit involving an express trust and a paid fiduciary, the trustee was removed from his post based on proof of his undue influence over the beneficiary. Although the urge to award counsel fees in favor of the trust and against the ousted trustee is understandable, it is not permitted under our court rule governing fee shifting. I would not expand our case law to cover it.

The majority acknowledges that "the history of [*Rule* 4:42-9] demonstrates that New Jersey has a strong policy against the shifting of counsel fees." *Ante* at 293, 823 *A*.2d at 7. A long-standing exception to that policy allows a plaintiff "the right to recover attorney's fees incurred in other litigation with a third person, if [the plaintiff] became involved in that litigation as a result of a ... tortious act by the present defendant." *Ante* at 294-95, 823 *A*.2d at 8 (quoting *In re Estate of Lash*, 169 *N.J.* 20, 31, 776 *A*.2d 765 (2001)). In other words, one has the right to recover attorneys' fees when such fees are a provable element of damages incurred in litigation with third parties. I part company with my colleagues, however, when they take the momentous step of holding that the estate can recover its fees incurred directly in litigation against the fiduciary, Bono, and against Serena. The majority clearly understands the import of its holding: "[t]hat claim directly implicates the American Rule.... To charge them with the counsel fees incurred by the Foundation and Parkinson as plaintiffs is tantamount to charging the losing parties with the prevailing parties' counsel fees." *Ante* at 296, 823 *A*.2d at 9.

The "American Rule," or principle, that litigants should bear their own costs for counsel fees was recognized by the United States Supreme Court as early as 1796. See *Arcambel v. Wiseman*, 3 *U.S. (Dall.)* 306, 1 *L.Ed.* 613 (1796). As that Court has explained, the outcome of litigation "is at best uncertain," and one should therefore "not be penalized for merely defending or prosecuting a lawsuit." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 *U.S.* 714, 718, 87 *S.Ct.* 1404, 1407, 18 *L.Ed.*2d 475, 478 (1967). In addition, "the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration." *Ibid.; see also Lash, supra,* 169 *N.J.* at 43, 776 *A.*2d 765.

*Rule* 4:42–9 represents our Court's policy determination that the American Rule generally governs the award of fees in New Jersey. That rule "requires a denial of fees in the normal course of events." *McGuire v. City of Jersey City*, 125 *N.J.* 310, 326, 593 *A.*2d 309 (1991). When originally enacted, it pointedly sought to "eliminate the abuses of the pre–1948 chancery practice of granting excessive fees to favored members of the bar." *Satellite Gateway Communications, Inc. v. Musi Dining Car Co.*, 110 *N.J.* 280, 285, 540 *A.*2d 1267 (1988); *see also Sunset Beach Amusement Corp. v. Belk*, 33 *N.J.* 162, 167, 162 *A.*2d 834 (1960) ("This rule constituted a policy decision to break with the practice of the former Court of Chancery which authorized counsel fees to the victor in the ordinary adversary proceeding.... In actual operation it proved onerous upon litigants and spawned charges of favoritism."); Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:42–9 (2003). Indeed, shortly after the rule originally was adopted, the Legislature passed a bill to overturn the rule, which Governor Driscoll vetoed, stating that it "would revive an unhappy practice that has been generally repudiated." *State v. Otis Elevator Co.*, 12 *N.J.* 1, 27, 95 *A.*2d 715 (1953) (Jacobs, J., dissenting). For over fifty years, the Court has resisted the temptation to carve out exceptions, adhering to the policy determination codified

in the rule despite the sympathetic facts in individual cases no different from those presented here.

*Liberty Title & Trust Co. v. Plews,* 6 *N.J.* 28, 77 *A.*2d 219 (1950), also involved an express trust and a paid fiduciary. Writing for the Court, Chief Justice Vanderbilt stated that the proofs "demonstrate[d] conclusively that the trustee was guilty of self-interest, self-dealing, private profit-taking and flagrant mismanagement ... all of which it successfully concealed from the court." *Id.* at 37, 77 *A.*2d 219. Nonetheless, the Court denied counsel fees, stating that despite the fraud, the then-recently enacted rule on fee shifting "specifically enumerated the types of actions in which allowances to counsel may be made, and the discretion of the trial court is limited to the granting or denying of allowances in such actions." *Id.* at 44, 77 *A.*2d 219. The Court underscored that "[i]t was not contemplated that the rule would or could be completely dispensed with in individual cases." *Ibid.*

Sixteen years later in *Grober v. Kahn,* 47 *N.J.* 135, 219 *A.*2d 601 (1966), Chief Justice Weintraub found it necessary to reiterate the Court's adherence to the policy codified in our court rules, again in the context of an assertion that fraud by a fiduciary should give rise to an award of counsel fees. The Chief Justice understood the natural desire to award fees in such circumstances, stating that "[t]here is a defensible feeling that counsel fees should be awarded in a case of fraud, and if the wrongdoer has breached as well a duty of loyalty, that feeling is intensified." *Id.* at 150, 219 *A.*2d 601. Nonetheless, the Court rejected the argument that counsel fees should be allowed, and held that "imposition of counsel fees is a policy issue which was resolved when our rules of court were formulated. If a change is to be made, it should be made with directness and in relevant terms. Meanwhile, the policy of our rule should be honored." *Id.* at 151, 219 *A.*2d 601.

Thus, we have adhered strictly to our court rule in the past, recognizing that "sound judicial administration is best advanced if litigants bear their own counsel fees. In accordance with this policy, unless legal fees are authorized by statute, court rule, or

contract, they are not recoverable." *Satellite Gateway, supra,* 110 *N.J.* at 285, 540 *A.*2d 1267 (citations omitted). However, despite recognizing this "well-established rule," *ibid.,* the majority chooses to award counsel fees in this case, without any statute, court rule, or contract permitting an authorization. The majority asserts that it will not open the floodgates to fee shifting because the counsel-fee award is limited to the particular facts here involving fraud by a fiduciary, an "egregious intentional tort" that requires clear and convincing evidence. *Ante* at 300, 823 *A.*2d at 11.

The assertion that this holding will be circumscribed by the narrow facts of this case does not withstand scrutiny. Once the Court decides that it can pick and choose from among individual cases when to deviate from the traditional requirement that there must be a statute, rule, or contract allowing an award of counsel fees, there is no discernible difference between fees in a case of fraud by a trustee and fees in the case of any other intentional tort. In either, a prevailing plaintiff has incurred harm (including attorneys' fees) because of the intentional tortious acts of another, and may argue, based on today's holding, that he or she should be entitled to fees to be made whole.

The majority justifies its holding by analogizing this award of counsel fees to awards authorized by *Saffer v. Willoughby,* 143 *N.J.* 256, 670 *A.*2d 527 (1996), and *Packard–Bamberger & Co. v. Collier,* 167 *N.J.* 427, 771 *A.*2d 1194 (2001), wherein the Court allowed fee shifting in attorney-malpractice cases. However, as explained by the dissent in *Lash, supra,* those departures were justified only because they were grounded in this Court's exclusive and "unique role in regulating the bar." *Lash, supra,* 169 *N.J.* at 44, 776 *A.*2d 765 (Verniero and LaVecchia, JJ., dissenting). Consistent with that rationale, the Court in *Packard–Bamberger, supra,* emphasized that "a plaintiff must demonstrate the existence of an attorney-client relationship as a prerequisite to recovery [of attorneys' fees]." 167 *N.J.* at 443, 771 *A.*2d 1194. The Court specifically noted that the defendant in *Packard–Bamberger* acted in a dual capacity, as a corporate director and as legal

counsel, and owed the plaintiffs a fiduciary duty in both roles. *Ibid.* However, it was only due to the existence of the attorney-client relationship that fees could be shifted as consequential damages to the attorney because, as the Court emphasized, "[the defendant] violated the duty he owed [the plaintiffs] as legal counsel." *Ibid.* If the defendant had not been legal counsel, and had only violated his fiduciary duty as a director, "attorneys' fees would not have been appropriate unless authorized by contract, statute, or some other specific rule." *Ibid.* Accordingly, the restricted holdings in *Saffer* and *Packard–Bamberger* are not persuasive support for the counsel-fee shifting that the Court now authorizes.

In sum, the majority's justification for its holding is unsatisfying—not only because of the lack of statute, rule, or contract authorizing the award (as has traditionally been required), but even more so because, as explained above, the Court has considered, and rejected, awarding fees in cases that are indistinguishable from the case at bar. The desire to award counsel fees in extreme circumstances, such as a fraud committed by a fiduciary, is understandable. Fraud, especially by a fiduciary, is a contemptible thing; but the efficient and equitable administration of justice is best served by adherence to the rule that counsel fees will not be awarded except when provided for by rule, statute, or contract. Today's decision is a step towards reviving the pre–1948 "unhappy practice" that our Court rectified with the promulgation of *Rule* 4:42–9. I decline to join in a decision that undercuts our court rules. Accordingly, I respectfully dissent.

Justice VERNIERO joins in this dissent.

*For reversing and remanding*—Chief Justice PORITZ and Justices COLEMAN and LONG—3.

*For affirming*—Justices VERNIERO and LaVECCHIA—2.