NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4532-14T1

IN THE MATTER OF THE
ESTATE OF ALFRED
FINOCCHIARO, SR., Deceased
_______________________________

ESTATE OF ALFRED FINOCCHIARO, JR.
Deceased, CHAD FINOCCHIARO, KELSEY
FINOCCHIARO and NICHOLAS FINOCCHIARO,

 Plaintiffs-Appellants,

v.

FRANK FINOCCHIARO,

 Defendant-Respondent.

________________________________

 Telephonically Argued November 1, 2016 -
 Decided November 30, 2017
 ember 30, 2017
 Before Judges Fuentes, Simonelli and Carroll.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Probate Part, Morris
 County, Docket No. P-1257-2012.

 Frank M. Williams argued the cause for
 appellants.

 Robert W. Mayer argued the cause for
 respondent.
 The opinion of the court was delivered by

FUENTES, P.J.A.D.

 This appeal concerns the validity of the last Will and

Testament of Alfred Finocchiaro, Sr., who died in Dobson, North

Carolina from cardiac arrest on August 18, 2011 at the age of

eighty-nine. On July 2, 2012, decedent's son Frank Finocchiaro1

successfully admitted his father's 2007 non-resident Will to

probate in the Office of the Surrogate of Morris County. On

October 16, 2012, Peggy M. O'Dowd, the estranged wife of decedent's

late son Alfred, Jr., and his children Chad, Kelsey and Nicholas,

filed a verified complaint in the Morris County Chancery Division,

Probate Part, seeking to nullify the 2007 Will and revoke the

letters testamentary issued to Frank.

 The case was tried before Judge Stephan C. Hansbury over a

two-day period on April 27 and 28, 2015. Plaintiffs claimed three

grounds for invalidating decedent's 2007 Will: (1) lack of

testamentary capacity; (2) undue influence by his son Frank; and

(3) improper execution. Plaintiffs sought to invalidate the 2007

Will and reinstate a Will decedent executed in 2001 that contained,

inter alia, specific bequests to Chad, Kelsey and Nicholas, and

1
 In the interest of clarity, we will refer to the individuals
whose last name is "Finocchiaro" by their first name. We intend
no disrespect.

 2 A-4532-14T1
directed the residuary estate to be equally divided between his

two sons, Frank and Alfred, Jr., per stirpes in fee simple

absolute. Plaintiff also sought punitive damages and an award of

counsel fees.

 In support of their claims, plaintiffs presented the

testimony of Dr. Robert Bock, a family practice physician who

briefly treated decedent in 2005. Judge Hansbury also granted

plaintiffs' application to admit Dr. Bock as an expert witness in

the field of "general family medicine, competency determination

and geriatric care." Plaintiff also called Detective James A.

Mandeville, who was one of the Pequannock Police Officers who

responded to decedent's residence on December 29, 2006, the day

Alfred, Jr. committed suicide. Detective Mandeville testified

about the circumstances surrounding Alfred, Jr.'s suicide. The

balance of plaintiffs' case consisted of testimony from O'Dowd and

from the children she had with Alfred Jr.

 Defendant's case consisted of Frank's testimony and that of

John A. Snowdon, Sr., the attorney who prepared the March 1, 2007

Will. Frank described his father's emotional state and cognitive

abilities during the time he cared for him after Alfred, Jr.'s

death. Snowdon testified about his interactions with Frank and

decedent and the procedures he followed to ensure that decedent

had the testamentary capacity to execute the 2007 Will.

 3 A-4532-14T1
 After considering the evidence presented by the parties,

Judge Hansbury found plaintiffs did not prove, by clear and

convincing evidence, that Frank unduly influenced decedent to

disinherit Alfred Jr.'s children or that decedent lacked the

testamentary capacity to dispose of his estate at the time he

executed the March 1, 2007 Will. Judge Hansbury also found that

Snowdon's testimony describing the manner the Will was executed

satisfied the requirements of N.J.S.A. 3B:3-23.2

 Against this record, plaintiffs now appeal arguing that they

were "manifestly denied justice" because Judge Hansbury's factual

findings and application of the relevant legal standards were

clearly erroneous. We disagree and affirm substantially for the

reasons expressed by Judge Hansbury in his oral opinion delivered

from the bench on April 29, 2015. We gather the following facts

from the evidence presented by the parties before the Chancery

Division.

2
 N.J.S.A. 3B:3-23 provides:

 If an issue as to the execution of a will
 arises in a contested probate action, the
 testimony of at least one of the attesting
 witnesses, if within the State, competent and
 able to testify, is required. Other evidence
 is admissible as to the due execution of a
 will.

 4 A-4532-14T1
 I

 At the time of his death on August 18, 2011, Alfred, Sr.

resided with his son Frank and his wife Jacqueline in Boonville,

North Carolina. Decedent's wife Florence and his older son Alfred

Jr., both predeceased him. As reflected in the certificate issued

by the Morris County Surrogate, decedent was survived by his son

Frank and four grandchildren, Chad, Kelsey, Nicholas and William

Ray Smith, Jr. On May 22, 2001, decedent executed a last Will and

Testament that designated Frank as executor and Alfred Jr. as the

substitute executor. This Will contained the following specific

bequests and provisions:

 1) To my grandson, WILLIAM RAY SMITH, JR., I
 leave the sum of $30,000.00

 2) To my granddaughter, DARLEEN MCCLELLAN, I
 leave the sum of $5,000.00.

 3) To my grandson, NICHOLAS FINOCCHIARO, I
 leave the sum of $5,000.00.

 4) To my grandson, CHAD FINOCCHIARO, I leave
 the sum of $5,000.00.

 5) To my granddaughter, KELSEY FINOCCHIARO, I
 leave the sum of $5,000.00.

 6) To my great-granddaughter, HAILEY MARIE
 SMITH, I leave the sum of $5,000.00 and

 7) To my great-grand[son], WILLIAM RAY SMITH,
 I leave the sum of $5,000.00.

 8) To any unborn or afterborn grandchildren
 or great-grandchildren not specifically

 5 A-4532-14T1
 name[d] above, I leave the sum of $5,000.00
 for each.

 9) To my two sons FRANK T. FINOCCHIARO and
 ALFRED F. FINOCCHIARO, I leave the property
 located on Highway 71, Scohata, Louisiana,
 along with all the rights, leases, contracts
 and appurtenances thereto.

The 2001 Will also divided the residuary estate equally between

Frank and Alfred, Jr., per stirpes in fee simple absolute.

 On March 1, 2007, decedent executed a second Will that

expressly revoked "all prior Wills and Codicils made by me." The

2007 Will designated Frank as executor and William Ray Smith, Jr.,

as the substitute executor. The 2007 Will contained the following

specific bequests and provisions:

 1) To my grandson, WILLIAM RAY SMITH, JR., I
 leave the sum of THIRTY THOUSAND DOLLARS
 ($30,000.00).

 2) To my granddaughter, DARLEEN MCCLELLAN, I
 leave the sum of FIVE THOUSAND DOLLARS
 ($5,000.00).

 3) To my grandson, NICHOLAS FINOCCHIARO, I
 leave the sum of FIVE THOUSAND DOLLARS
 ($5,000.00).

 4) To my grandson, CHAD FINOCCHIARO, I leave
 the sum of FIVE THOUSAND DOLLARS ($5,000.00).

 5) To my granddaughter, KELSEY FINOCCHIARO, I
 leave the sum of FIVE THOUSAND DOLLARS
 ($5,000.00).

 6) To my son FRANK T. FINOCCHIARO, I leave the
 property located on Highway 71, Scohata,

 6 A-4532-14T1
 Louisiana, along with all rights, leases,
 contracts and appurtenances thereto.

 The 2007 Will bequeathed the residuary estate to Frank. In

the event Frank did not survive him, decedent left the residuary

of his estate to his daughter-in-law Jacqueline Finocchiaro,

Frank's wife. Thus, the 2007 Will removed two significant

provisions that were part of the 2001 Will: (1) the specific

bequests to Hailey Marie Smith and to decedent's unborn or after-

born grandchildren or great-grandchildren; and (2) the per stirpes

provision in the distribution of the residuary estate between

Frank and Alfred, Jr., thus denying Alfred, Jr.'s children the

right to equal shares of their late father's share of the residuary

estate.

 Dr. Bock was the first witness to testify at the trial. He

began seeing decedent as a patient when he took over the practice

of decedent's former physician. Dr. Bock testified his first

contact with decedent was in September 2005. Although he did not

remember the visit, Dr. Bock was able to describe decedent's

physical and emotional status based on the medical notes he took

to document the encounter. Dr. Bock wrote that decedent was

"overall feeling well" and said "he could still rage hell." He

did not have "any chest pain" or "trouble breathing," or any signs

of "acute illness." Dr. Bock testified that decedent told him he

 7 A-4532-14T1
was "eating okay" and "his moods were good."

 Dr. Bock next saw decedent approximately one month later.

According to his notes, decedent was more "agitated" and "confused"

that day. Although "he didn't actually complain of anything,"

Dr. Bock asked his son Alfred Jr., to try to get him decedent's

medical records because he had been "diagnosed with bladder cancer

[six] years before." Dr. Bock wrote that decedent's "blood

pressure was real high, which . . . goes along to him being

agitated[.]" On that day, Dr. Bock found him "only alert and

oriented X1." This meant "he knew his name but didn't know where

he was."

 On that day, Dr. Bock "made a note of his dementia" on

decedent's file. Dr. Bock testified that he left a message with

his son Alfred Jr., and ordered "a CAT scan of the abdomen and an

ultrasound of the neck." He saw decedent again on November 1,

2005. On this day, Dr. Bock testified that decedent "wasn't

delusional." Dr. Bock spoke to "his daughter-in-law"3 about

scheduling the "scans." Dr. Bock also noted that decedent had not

started to take his blood pressure medication and his "[b]lood

pressure was high, still."

 Dr. Bock next saw decedent on December 29, 2005. He noted

3
 We presume this reference to "daughter-in-law" applies to Peggy
O'Dowd.

 8 A-4532-14T1
decedent's condition "was better." Although he was still smoking,

his blood pressure was better. Dr. Bock continued to see decedent

on this semi-monthly basis in 2006. His main medical concern was

decedent's elevated blood pressure aggravated by his continued

smoking. According to Dr. Bock, he visited decedent at his home

on a regular basis in 2006 and noted that his physical appearance

was deteriorating throughout the months. The last time he saw him

that year was in December 2006. Dr. Bock wrote decedent was:

"Walking about at home. Smoking. Pleasant. Conversive.

Appropriate. Greeted me at the door. No complaints. Mild cough.

Wants to stay home. Refusing nursing home placement." Despite

these indicia of normalcy and cognitive awareness, Dr. Bock

testified that decedent "was unaware of my name or what I did,

even though I was there for the last year."

 Dr. Bock's relationship with decedent ended on January 26,

2007, when he encountered decedent's son Frank. Dr. Bock wrote

that Frank was "[v]ery agitated" and did not want him to continue

to treat his father. Ultimately, Dr. Bock opined that decedent

suffered from a chronic, progressive course of dementia from

October 27, 2005 until the last time he examined him in December

2006. In his opinion, decedent was not competent during this

entire time period. In response to plaintiffs' counsel's

questions, Dr. Bock provided the following opinion testimony with

 9 A-4532-14T1
respect to the ultimate issue before the court.

 Q. So, therefore, Doctor, in your opinion do
 you believe that he could understand the terms
 of a will?

 A. That's something that we never discussed,
 but I wouldn't expect so, no.

 Q. Given his medical condition?

 A. No.

 Q. And do you believe that he would be able
 to understand or to express a proposed
 distribution plan route under a will? Or what
 he'd like done after he died?

 A. I don't think he'd even understand a
 distribution plan, or necessarily what that
 meant. What he would want to happen like if
 he got - - if he wanted to be buried or
 cremated? He might have an opinion on that.
 But in terms of long—term estate planning and
 things, you know, part of the - - I don't
 think he would have the competency for that.

 Pequannock Police Detective Mandeville testified that he and

other police officers responded to a report of a suicide at

decedent's home on December 29, 2006. Upon arrival, they found

that Alfred, Jr. had hanged himself in the garage. Mandeville

remembered speaking with Alfred Jr.'s wife Peggy O'Dowd, who did

not reside at the house. Relying on police records to refresh his

recollection, Mandeville testified that he believed Alfred, Jr.

and his father Alfred, Sr. were the only residents.

 10 A-4532-14T1
 Peggy O'Dowd testified that from October 2005 to December

2006, her husband Alfred, Jr. lived with his father. She and her

husband were separated and estranged from each other. During this

same period of time, she would go to the house where her husband

lived "on occasion." According to O'Dowd, she had "a very good

relationship" with her father-in-law "during the period of my

marriage." She and her estranged husband took care of whatever her

in-laws needed.

 On cross-examination, O'Dowd confirmed that she had a pending

divorce action at the time Alfred, Jr. took his own life. When

asked if she had a tumultuous marriage, O'Dowd responded: "We had

. . . a marriage at sometimes made in hell, yes." She sought and

obtained a domestic violence restraining order against her

husband. O'Dowd testified that she was forced to get several

restraining orders against her husband over the years, mostly due

to his alcoholism. O'Dowd and Alfred, Jr. also had significant

financial problems and filed for bankruptcy protection.

 O'Dowd described her father-in-law as a reclusive man who was

accustomed to a daily routine of going to work and returning home

without socializing. Even before his illness, decedent never

answered the telephone. He depended on his wife to take care of

the house work and the family's finances. O'Dowd also stated that

decedent did not "believe[] in doctors." She did not seek out

 11 A-4532-14T1
decedent or have any communications with him at the time her

husband committed suicide. In fact, she did not see decedent

until Alfred, Jr.'s wake.

 Alfred, Jr.'s daughter Kelsey was fifteen years old at the

time of her father's death in December 2006. She described her

relationship with decedent as "very close." Kelsey stated, "I

lived right down the street my whole life[;] so I saw him all the

time[;] we were very close." She testified that she spent

"[a]lmost every weekend" at her grandfather's house in 2006. This

also allowed her to visit her father who was residing there at the

time. When asked to describe her relationship with her uncle

Frank in 2006, Kelsey responded: "I've never had a relationship

with my uncle." She did not see decedent again or have any form

of contact with him after her father's wake.

 Chad testified that he enlisted in the Navy a week after his

father Alfred, Jr.'s death in 2006. According to Chad, decedent

seemed confused during this time period in 2006. He too did not

see decedent again and did not have any contact with him after his

father's death. Nicholas was twenty-four years old at the time

his father Alfred, Jr. committed suicide. Unlike his two siblings,

Nicholas testified that he did not see or have any kind of regular

contact with his grandfather in 2006 "because I was kind of

strained [sic] with my father." He learned of his grandfather's

 12 A-4532-14T1
passing from his mother, Peggy O'Dowd. Plaintiffs rested after

Nicholas's testimony.

 Defendant called William Ray Smith as his first witness.

Smith is the son of decedent's daughter. She survived her father's

passing but died before this trial began in April 2015. Smith is

decedent's oldest grandchild. Unlike his cousins, Smith was

unaffected by decedent's repudiation of the 2001 Will. His bequest

remained the same in the 2007 Will. Smith testified that when he

was a child he lived with his maternal grandparents for

approximately twenty years, including his high school years. He

said his grandparents treated him like a son. In response to

defense counsel's question, Smith testified that from 2000 until

decedent relocated to North Carolina with Frank in 2006, he saw

his grandfather on a regular schedule "every other week." His

visits usually lasted "a couple of hours" and at times included

having dinner with him. When asked to describe his grandfather's

demeanor and cognitive abilities during this time, Smith stated

that "[h]e had his good days . . . and his bad days."

 The Pequannock Police Department contacted Smith after

Alfred, Jr.'s suicide and requested that he come to decedent's

residence. After Alfred, Jr.'s death, Smith stayed at decedent's

residence until his uncle Frank arrived approximately four days

later. Smith testified that decedent was "very depressed" and

 13 A-4532-14T1
inconsolable during this time. Smith made clear, however, that

decedent understood the gravity of the situation; but he was in

disbelief over his son's death. Smith testified that even at

Alfred, Jr.'s wake decedent was able to communicate and tell him

what was on his mind.

 Frank and his wife Jacqueline were the last two witnesses to

testify. Frank testified that he and Jacqueline went to decedent's

house after Alfred, Jr.'s death to assess the situation and assist

with the burial arrangements. According to Frank, his father only

required assistance "with meals and paying bills[.]" He emphasized

that his father needing assistance with these two particular tasks

was not necessarily indicative of any age-related degeneration or

limitation. His mother (decedent's wife) had cooked all of the

family's meals and paid the household expenses during the entire

time his parents lived together as husband and wife. His father

"never cooked in his life."

 Frank testified that his father stopped driving after his

brother's suicide. Decedent relied on him for transportation.

Jacqueline testified that decedent knew who she was and was happy

to see her. He was also understandably distraught and upset over

his son's death. Jacqueline claimed she was able to maintain

productive conversations with her father-in-law during the time

she was with him in this State. She testified that he confided

 14 A-4532-14T1
in her his fear of being left alone. According to Jacqueline,

decedent was receptive to the idea of moving to North Carolina to

be near his son Frank and her.

 Jacqueline returned to North Carolina on January 9, 2007.

Frank remained behind to care for his father. On March 1, 2007,

decedent executed a new Will in New Jersey. Frank and his father

flew to North Carolina shortly thereafter. Upon decedent's arrival

in North Carolina, Jacqueline and Frank rented an apartment for

him to live, located across the street from their home.

 Jacqueline testified that she became very close to decedent

during the time he lived across the street from her home. In

fact, she voluntarily assumed most of the responsibility for his

care. They worked together on house chores or mini-projects,

including the construction of a fence. Jacqueline testified that

decedent was able to engage in conversations "most of the time."

However, there were times when he became confused. This confusion

could last for hours or for days. Conversely, there were times

when he was lucid for days.

 In May 2007, Jacqueline took decedent to see a doctor because

she was concerned about his weight and frailness. After engaging

in conversation with him, the doctor told Jacqueline that he

believed decedent was suffering from Alzheimer's disease. The

doctor suggested that he submit to certain cognitive tests to

 15 A-4532-14T1
confirm the diagnosis. Decedent chose not to take the tests;

Jacqueline testified that she did not attempt to persuade him

otherwise. The doctor suggested that decedent take Aricept, a

medication designed to slowdown the progression of the symptoms

of Alzheimer's.4 Jacqueline agreed.

 Jacqueline testified that decedent began to decline

physically and mentally in 2009. Frank corroborated his wife's

testimony. He testified that his father was in "real good shape"

for approximately two years after his move to North Carolina.

Alfred, Sr. died on August 18, 2011. Frank testified that he did

not contact O'Dowd or any of Alfred, Jr.'s children to inform them

of his passing. Frank provided the Morris County Probate Clerk

with an address where he believed they may be residing. According

to Frank, the Probate Court told him that he was not legally

obligated to notify these individuals directly. He was only

obligated to place a formal notification in the newspaper. Frank

complied accordingly.

4
 Dr. Bock testified that Aricept is a medication for dementia and
is typically prescribed to dementia patients as part of an
aggressive treatment plan. Dr. Bock explained that he did not
prescribe Aricept for decedent because it only slows the on-set
of dementia. He opined it would have been futile given decedent's
deteriorating state.

 16 A-4532-14T1
 II

 When a judge sits as the trier of fact in a bench trial, the

judge must make factual findings based on the evidence presented

by the parties. In this case, the evidence consisted primarily

of the testimony of the witnesses. Here, Judge Hansbury found

"no problem with credibility of anyone. I really think everybody

pretty much told me the truth." Our standard of review of Judge

Hansbury's factual findings is well-settled. "Factual findings

premised upon evidence admitted in a bench trial 'are binding on

appeal when supported by adequate, substantial, credible

evidence.'" Potomac Ins. Co. of Ill. ex rel. OneBeacon Ins. Co.

v. Pa. Mfrs.' Ass'n Ins. Co., 215 N.J. 409, 421 (2013) (quoting

Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). See also Rova

Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484

(1974). This deference is especially appropriate "when the

evidence is largely testimonial and involves questions of

credibility." Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013),

(quoting Cesare, supra, 154 N.J. at 412).

 Guided by these standards, we discern no legal basis to

disturb Judge Hansbury's factual findings. However, we review

de novo and afford no deference to the trial court's rulings which

constitute a determination of law. Estate of Hanges v. Metro.

Prop. & Cas. Ins. Co., 202 N.J. 369, 382-83 (2010).

 17 A-4532-14T1
 As the parties contesting decedent's 2007 Will, plaintiffs

bear the burden of proving undue influence. In re Estate of

Stockdale, 196 N.J. 275, 303 (2008). Furthermore, undue influence

is a form of fraud that must be proven by clear and convincing

evidence. In re Niles Trust, 176 N.J. 282, 300 (2003). Our

Supreme Court has held that

 undue influence is a mental, moral, or
 physical exertion of a kind and quality that
 destroys the free will of the testator by
 preventing that person from following the
 dictates of his or her own mind as it relates
 to the disposition of assets, generally by
 means of a will or inter vivos transfer[.]

 [In re Estate of Folcher, 224 N.J. 496, 512
 (2016) (quoting Stockdale, supra, 196 N.J. at
 302-03).]

 Here, Judge Hansbury reviewed the evidence presented at trial

and did not find any evidence to support the claim of undue

influence by Frank. Judge Hansbury found decedent's decision to

repudiate the 2001 Will was based primarily on Alfred, Jr.'s

suicide and the reasons he believed precipitated it.

 I find the defendant [Frank] credible and I
 do find the decedent was extremely upset at
 the loss of his son and it's not hard to
 imagine that. I have never suffered through
 a suicide; but, to lose a child I've been told
 is the worst thing in the world. It's worse
 than losing anybody else and to lose a child
 at his own hands has got to be the most
 traumatic experience one can have.

 18 A-4532-14T1
 So, Senior now had one son and the testimony
 through the defendant here was that he blamed
 Peggy and the kids for Junior's suicide.
 That's not out of the blue, because, given the
 nature of the marriage, . . . I can conclude
 that that's a legitimate thought of the
 decedent. The TRO's, the divorce, the
 separation between them, the lack of contact
 between plaintiff and defendants and the
 decedent for all those years, meaning from the
 date of the wake forward, it fits with that
 conclusion. I find it a credible statement.

 As the trier of fact, Judge Hansbury chose to rely on this

evidence to support his legal conclusion. We review a trial

judge's legal conclusions de novo. The evidence amply supports

Judge Hansbury's conclusion. It is undisputed that O'Dowd and her

children severed all contacts with decedent immediately after

Alfred, Jr.'s suicide. When decedent relocated to North Carolina,

Frank and Jacqueline were his only family. Finally, decedent's

decision to include in the 2007 Will the same $30,000 bequest to

his grandson Smith that he included in the 2001 Will is further

evidence that he was acting under his own volition.

 We next address plaintiffs' argument claiming Judge Hansbury

erred when he found decedent had the testamentary capacity to

execute the 2007 Will. We begin our analysis of this issue by

noting that "[t]he findings of the trial court on the issues of

testamentary capacity and undue influence, though not controlling,

are entitled to great weight since the trial court had the

 19 A-4532-14T1
opportunity of seeing and hearing the witnesses and forming an

opinion as to the credibility of their testimony." Matter of Will

of Liebl, 260 N.J. Super. 519, 523 (App. Div. 1992) (quoting

Gellert v. Livingston, 5 N.J. 65, 78 (1950)), certif. denied, 133

N.J. 432 (1993). Plaintiffs must rebut the presumption that "the

testator was of sound mind and competent when he executed the

will." Id. at 524 (quoting Gellert, supra, 5 N.J. at 71).

Plaintiffs must satisfy this burden of proof by clear and

convincing evidence. Ibid.

 Plaintiffs rely on the testimony of Dr. Bock in support of

their contention that decedent lacked testamentary capacity when

he executed the 2007 Will. In rejecting this argument, Judge

Hansbury accepted as credible the testimony of John A. Snowdon,

Sr., the attorney who drafted the March 1, 2007 Will and was

present when decedent executed it. Judge Hansbury noted that

Snowdon met with decedent approximately two weeks after Alfred,

Jr. died, and personally discussed with decedent what plans he had

concerning the disposition of his estate.

 Following this meeting, Snowdon sent decedent drafts of the

Will for his review and approval. Judge Hansbury specifically

found that this process took approximately six weeks, which "was

plenty of time [for decedent] to reflect . . . plenty of time to

calm down, to overcome the initial shock of losing his son[.]"

 20 A-4532-14T1
Stated differently, decedent was not pressured to reach this

decision. Judge Hansbury also did not find strange or suspicious

that Snowdon did not retain any notes in his file of his meetings

with decedent. The judge concluded:

 I do find that the [decedent] had sufficient
 testamentary capacity to execute the
 documents. He went in and out. That I find,
 not a problem. He suffered from dementia,
 that I find; but, there's [no] evidence that
 he was incapable of understanding what his
 desires were and as I said, even the doctor
 said he could decide what to do with his body.

 . . . .

 So, I do find that he had sufficient capacity
 to execute the Will, understanding that he
 suffered from dementia, had bad days and had
 good days.

 The evidence presented at trial, including Dr. Bock's

testimony, supports this finding. There is no question that

decedent suffered from dementia that was progressing commensurate

with his age and was likely exacerbated by the emotional trauma

associated with Alfred, Jr.'s death. The testimony of his grandson

Smith corroborated Dr. Bock's testimony in one key respect. Both

of these witnesses testified that decedent had days in which he

was able to have "normal" conversations.

 This court has held that a person who may at times lack

testamentary capacity may be deemed capable of executing an

enforceable will if they have "lucid intervals." See Wallhauser

 21 A-4532-14T1
v. Rummel, 25 N.J. Super. 358, 366 (App. Div. 1953); see also In

re Politowicz, 124 N.J. Super. 9, 12 (App. Div. 1973). We discern

no legal basis to disturb Judge Hansbury's well-reasoned legal

conclusion upholding the validity of the March 1, 2007 Will.

 We affirm the judgment of the Chancery Division substantially

for the reasons expressed by Judge Hansbury in his oral opinion

delivered from the bench on April 29, 2015.

 Affirmed.

 22 A-4532-14T1