**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0154-15T2

IN THE MATTER OF EVELYN
WORLEY, an incapacitated
person.

_____

DWIGHT WORLEY and DANIEL
WORLEY,

    Plaintiffs-Appellants/
    Cross-Respondents,

v.

RICHARD WORLEY,

    Defendant-Respondent/
    Cross-Appellant.

_____

Argued February 6, 2017 — Decided March 28, 2017

Before Judges Nugent and Currier.

On appeal from the Superior Court of New
Jersey, Chancery Division, Gloucester County,
Docket No. P-13-00468.

Ronald P. Sierzega argued the cause for
appellants/cross-respondents (Puff &
Cockerill, LLC, attorneys; Susan C. Carpenter,
on the briefs).

Dante B. Parenti argued the cause for
respondent/cross-appellant (Hoffman DiMuzio,

attorneys; Mr. Parenti and Ryan S. Hoffman, on the briefs).

Thomas A. Hagner argued the cause for respondent Evelyn Worley (Hagner & Zohlman, LLC, attorneys; Mr. Hagner and Thomas J. Hagner, on the briefs).

PER CURIAM

In this matter, we review the judicial determinations rendered, subsequent to a trial, regarding the care and guardianship of Evelyn Worley (Evelyn)[1] and the subsequent disposition of her assets. Two of Evelyn's three surviving sons, Dwight and Daniel,[2] commenced this action against their brother Richard, following the execution of a Power of Attorney (POA) and attempted modification to the named beneficiary on an investment account. After a review of the record in light of the applicable legal principles, we affirm the rulings as to the validity of the POA executed in favor of Richard, but reverse the court's determination that changed the beneficiary on a financial account to include all of Evelyn's surviving sons.

I.

We derive our summary of the facts from the evidence presented at trial over several days in April and May 2015. In 2009, Evelyn

---

[1] The parties are referred to by their first names for the clarity and ease of the reader as they share a last name.

[2] A fourth son, Roger, predeceased Evelyn.

2                                                                    A-0154-15T2

was diagnosed with mild dementia and potential onset of Alzheimer's disease. At the time, she was living in her own home and managing her daily affairs. Daniel and Richard assisted her with some tasks around the house and took her to medical appointments. Richard had begun handling Evelyn's checking account in 2007 in order to pay her bills. He did not have access to her savings account.

Dwight handled Evelyn's finances, was named executor in Evelyn's 2008 Will, and was her living representative in her health care directive prepared that same year. Dwight had her sign a POA in 2005. In the Wills executed by Evelyn in 1993 and 2008, she distributed her assets equally among her sons. The parties stipulated that Evelyn was competent when she signed all of these documents.

## A.

While working as a financial advisor in 1997, Dwight had assisted Evelyn in opening a Transfer on Death (TOD) account with his company, Waddell & Reed. He explained to his mother that the money in the account was hers as long as she was alive. Dwight was designated as the sole beneficiary on the account, and he told his mother that after her death, the money would pass to him. The

account was initially funded with a $100,000 investment.[3] The existence of this account was unknown to all of the other brothers until this litigation. Dwight testified that, as a seller of financial products, he had a confidential relationship with his clients and could not discuss a client's account with anyone else, including its existence.

In September 2011, Dwight sent a letter to his mother enclosing a POA for a different investment account. Evelyn executed the form which designated Dwight as her POA.

### B.

In Fall 2011, Evelyn's sons began investigating local assisted living facilities, anticipating that Evelyn might require more care than could be given to her at home. A facility was chosen and Evelyn began living there in November 2011. Although amenable to the move at first, Evelyn was complaining by the end of the third week and told each of her sons that she wanted to go home.

On December 10, 2011, Richard brought Evelyn to meet with an attorney, Christopher Manganello, to discuss the preparation of a new POA. Manganello prepared the document which Evelyn signed on December 14. The attorney made a video recording of his meeting

---

[3] At the time of the hearing in 2014 the account was valued at $250,000 and represented approximately 42% of Evelyn's estate.

with Evelyn that day. He explained that he did so "to make sure there was some type of record to show that this woman was oriented as best as she could be at a time and place and really meant to do what we were trying to do that day." He also suspected that the new POA would become an issue between the brothers. He stated: "So, I wanted some type of documentation for two reasons; to help protect my client and her wishes, but also to protect me as well."

Manganello testified that Evelyn was clear that she wanted Dwight removed from "having decision making power as [her] power of attorney and also to be able to ensure that she could leave [the assisted care facility]." Evelyn told him that Dwight did not communicate with her and that she felt more comfortable with Richard. Manganello described Evelyn as "feisty," "engaging," and "funny." "She seemed very with it . . . . She did not seem in any way disengaged or . . . any different than anybody else that comes to my office. She was of sound mind and . . . capacity."

Richard removed Evelyn from the assisted care facility in late December 2011. She remained in her home with a health care aide initially, and then full-time live-in help was required. In November 2013, Evelyn moved to a nursing home.[4]

---

[4] At the time of the appellate oral argument in February 2017, Evelyn reportedly was still living in the nursing home.

After the execution of the POA in December 2011, Richard learned about the Waddell and Reed account and contacted the firm on several occasions. He advised the firm that he wished to have the existing POA designating Dwight replaced with the newly executed one. There was no discussion of the beneficiary on the account.

Richard contacted Waddell again in March 2012 requesting a history of the account. The account representative needed to confirm with Evelyn her acquiescence with the request. During the conversation, Evelyn was unable to remember her social security number and she asked Richard for the information. Later that month, Richard called Waddell and stated that his mother "was made aware of some problems on her account as far as the way that it's set up and everything. She wanted to make some changes today." The account representative again spoke with Evelyn who was unable to provide her social security number and date of birth without prompting from her son. Evelyn gave permission for the representative to speak with Richard, who requested that Dwight be removed as the designated beneficiary and that Evelyn's estate be substituted as the beneficiary on the account. Richard also asked for an address change on the account. After being instructed

to send a written request for change of beneficiary, Richard asked that the original application form be provided to him as well.

A senior regulatory counsel and vice president of Waddell, Amy Rush, testified at the trial. Rush explained the training provided to the company's customer service representatives on senior abuse issues. She said both March conversations raised a "red flag" due to Evelyn's inability to remember her social security number and birth date, and the substance of the questions being asked by Richard. Rush testified further that she received a court order from Dwight during this timeframe that voided Richard's POA. The order required Richard to serve this notice on Waddell, which he had not done. She described this as "a huge red flag" and she instructed the customer service department not to distribute any money from the account, send out statements, or change the account's address. Rush stated that the beneficiary on the account was not changed as instructed by a court order that was subsequently presented to Waddell, and because Evelyn had never directed the change herself.

## D.

In January 2012, Manganello prepared a Will and healthcare directive for Evelyn's signature. The only change made to the Will was to substitute Richard as the executor; he was also named as the healthcare representative on the living will. Manganello

testified that he was certain that Evelyn wanted these documents prepared.

## II.

In March 2012, Dwight and Daniel (plaintiffs) presented an order to show cause and verified complaint seeking (1) to nullify the December 2011 POA as a product of the undue influence on Evelyn by Richard (defendant); and (2) a disclosure of any financial changes made to Evelyn's accounts by Richard during his capacity as designated POA. The order to show cause was granted.

On April 3, 2012, the chancery judge entered a joint consent order in which the parties agreed to its provisions until the final resolution of the matter. The order provided that: (1) the POA in favor of Richard executed by Evelyn on December 14, 2011 was void; (2) the will prepared by Manganello and executed by Evelyn was void; (3) Evelyn's financial assets would be managed by Dwight;[5] (4) Richard would manage Evelyn's checking account for her ordinary and usual monthly expenses; (5) Evelyn was to undergo a competency examination; and (6) Gerald Sinclair, Esq., was appointed by the court as counsel for Evelyn. The order required service by Richard's counsel on all of Evelyn's health care

---

[5] The order further clarified that no funds would be withdrawn from the accounts other than to care for Evelyn and that there would be no change to title or beneficiary designation on any account owned by Evelyn.

providers, assisted living facilities, and applicable financial institutions.

Plaintiffs amended the complaint in March 2013, seeking their appointment as co-guardians of their incapacitated mother and her estate. In his answer and cross-claims, Richard requested that he be appointed guardian for Evelyn. He also alleged that the creation of the Waddell investment account was a breach of the fiduciary duty owed by Dwight.

### III.

At trial, both parties presented witnesses to testify regarding Evelyn's mental capacity and cognitive functioning. Cynthia Furman, a registered nurse with Gloucester County Senior Services, stated she was contacted by Evelyn's family in November 2010 to assess Evelyn and provide care options for her.

Nurse Furman noted that although Evelyn was able to take care of her personal needs and hygiene, she required assistance from others to complete housework and shopping, prepare meals, take medication, and manage her finances. She found Evelyn to be only minimally impaired in her decision-making, although she exhibited difficulty making decisions in unfamiliar circumstances. In Furman's opinion, Evelyn's short term and procedural memory were impaired.

A-0154-15T2

Mary Ann Poekert was the home health companion assigned to Evelyn from 2010 to 2012. While working with Evelyn in 2011, prior to her admittance to the assisted living facility, Poekert stated that "[Evelyn] was having a lot of trouble remembering . . . . Then she was telling me that . . . there's people in here having parties at night. And she told me there was a man that would come into her bedroom and try and get her." She noticed an improvement in Evelyn after she returned from the assisted living facility. Poekert also recalled that Evelyn told her that "she wanted Rick to take care of everything, to be her power of attorney, to take care of her, to do whatever needed to be done." Poekert denied knowing anything about Evelyn's investment accounts, but stated that Evelyn knew Dwight had control of an account and said "she didn't want one son having control of everything." In response to questioning, Poekert added that Evelyn wanted her sons to all be treated the same. "[S]he said when she passed away, she wanted everything to be, you know, divided up evenly."

Plaintiffs presented Barry Rovner, M.D., a psychiatrist specializing in Alzheimer's disease, as an expert. Dr. Rovner reviewed Evelyn's medical records and listened to Manganello's video tape. He concluded that Evelyn was disoriented to time, and she did not understand why she was at the attorney's office in

December 2011. Based on the information presented to him, Dr. Rovner opined that Evelyn lacked the capacity to understand what a POA was and lacked the ability to execute her Will knowingly.

Plaintiffs also proffered the testimony of Danielle DiGregorio, Psy.D., who had performed neuropsychological evaluations of Evelyn in 2012 and 2013 at the request of Sinclair. A month before the trial, plaintiffs advised they were naming Dr. DiGregorio as an expert witness. No new report was provided. At the de bene esse deposition of Dr. DiGregorio taken several days before the commencement of trial, plaintiffs attempted to elicit her opinion of Evelyn's mental capacity at the time of the signing of the POA and the Will. The execution of those documents had taken place nine months before the doctor met Evelyn, therefore, that opinion was not contained in any of her reports.

Defense counsel objected at the deposition and renewed the objection at trial. The chancery judge sustained the objection and ordered the redaction of the expert's testimony regarding the previously undisclosed opinion.

Dr. DiGregorio performed a number of tests and concluded that Evelyn was in the mild to moderate stages of dementia. At her second evaluation, in May 2013, the doctor noted further deterioration in many areas of functioning.

Mr. Sinclair, as court-appointed counsel, met with Evelyn on five occasions, the first in April 2012. During those visits, Evelyn admitted she had memory lapses but was able to discuss her children and grandchildren cogently. Sinclair described her as having mild dementia. The attorney asked Evelyn about the December 2011 POA on several occasions, and she consistently told him that she "wanted Rick." She also consistently mentioned that she wanted her three sons to share equally after her death.

Sinclair issued three reports, each recommending that Richard be appointed the guardian of his mother, of both her person and her property. He believed that Richard had shown the greatest level of involvement with Evelyn and it was her own request. The attorney felt that Richard demonstrated the "aptitude and attitude" to be the guardian.

Richard presented Pogos Voskanian, M.D., a neuropsychiatrist, as his expert. Dr. Voskanian described Evelyn as having a mild degree of cognitive impairment in late 2011 and early 2012 but opined that she had testamentary capacity at that time. Upon reviewing Manganello's video recording of the execution of the POA, he found Evelyn's "speech was clear," "she provid[ed] good reasons for her choices," and she indicated a desire to be informed regarding her own care. "[E]lderly people do not know exact dates. . . . It does not mean lack of testamentary capacity. Actually

people can be demented and still have testamentary capacity. . . . Knowing the date is not [a] requirement."

                                 IV.

On June 29, 2015, the trial judge issued a lengthy comprehensive oral decision.[6] After setting forth her findings of fact, she rendered several legal conclusions. The judge first found that there was a presumption of undue influence by Richard, warranting the shifting of the burden of proof to him. She described the special relationship between Evelyn and Richard and the suspicious circumstances of the execution of the POA at Manganello's office. Noting that the defendant must rebut the presumption of undue influence by clear and convincing evidence, the judge found that Richard had abided by his mother's wishes. Her request was for him to remove her from the assisted care facility in December 2011. Based on the testimony and medical records, the judge found that Evelyn had the ability to form an opinion, express it, and she wanted to be heard about remaining in her own home. The judge stated: "If anything, Rick was doing exactly what [Evelyn] wanted him to do, getting her back to her home and out of the [assisted care facility]."

---

[6] An order reflecting the oral decision was issued on June 30, 2015.

In her decision, the judge relied on the testimony presented regarding Dr. Morton's notes[7] of his visits with Evelyn in late 2011.  On December 12, 2011, Dr. Morton wrote in an office note:

> It is clear to me that [Evelyn] would prefer that her son Rick be her power of attorney to help her with legal decisions . . . .  I think that Evelyn will do well in her own home if she has someone there to assist her with meals and medicine . . . . Her dementia is mild, and she could enjoy her home for some time yet if she had someone there to assist her full time.

The doctor also noted that Evelyn was sharper and brighter after the change in her medication.  The judge concluded:

> [Evelyn] had sufficient cognitive function to articulate her desire to live at home and her desire for Rick to be her POA.
>
> . . . .
>
> I am satisfied that the evidence established clearly and convincingly that Mrs. Worley wanted Rick to be her POA in November 2011 and that she had the capacity to communicate that decision and to sign a legal document implementing that decision.

In addressing Evelyn's capacity to sign the Will in 2012, the judge concluded to the contrary.  She stated: "There's no evidence that Mrs. Worley told anyone that she wanted Rick to be the executor of her Will . . . . So I'm satisfied that the proofs do

---

[7] Reports and office records of Dr. Morton of the Elmer Family Practice are discussed with several witnesses and admitted into evidence.  Dr. Morton did not testify, and his reports and medical records were not provided to us.

not establish clearly and convincingly that the Will was the voluntary and knowing act of Mrs. Worley." She, therefore, found the POA valid and enforceable, but ruled the 2012 Will was invalid. The judge declined to award any damages, finding that the early departure fees for Evelyn's withdrawal from the assisted care facility in 2011 was "money well spent" as Evelyn was happy to spend an additional two years in her home.

In addressing the TOD account, the judge determined that it did not satisfy the requirements to be considered an inter vivos gift. She concluded that the very nature of the account, a transfer on death, is that the money in the account is owned by the holder of the account; the TOD "is a conditional gift that if there is anything in the account at the time of death, it would go to that named beneficiary." The judge determined the account was not an irrevocable relinquishment in ownership nor an outright gift. Relying on Sinclair's testimony that Evelyn wished all of her sons to be treated equally, the judge ruled that the TOD account beneficiary should be changed to designate all three sons in equal shares.

In a second order on June 30, 2015, the court found Evelyn was an incapacitated person and unable to manage her own affairs. Richard was appointed the guardian of the person and property of Evelyn.

Plaintiffs filed a subsequent motion seeking a stay of the transfer of financial authority from Dwight to Richard until the resolution of the appeal, and an award of counsel fees for the guardianship application, as well as for the costs and fees incurred defending the POA granted to Dwight in 2005. Richard cross-moved for counsel fees for his guardianship application.

After hearing the parties' oral argument on August 12, 2015, the judge determined that it was not feasible to split the guardianship between Richard and Dwight because of the likelihood of friction and further litigation. In considering the requests for counsel fees under Rule 4:86-4(e), the judge noted her discretion to award fees if deemed appropriate. She stated that by the time the matter reached trial, it was not about the guardianship as Evelyn's mental condition had deteriorated. It was "a fight between brothers." Therefore, the judge found it appropriate to deny attorney's fees for the majority of the action. Plaintiffs were awarded $2500 for bringing the complaint and defendant was awarded $2500 for his efforts in prosecuting the guardianship. The parties were each responsible for their remaining attorney's fees and costs.[8]

[8] Plaintiffs' request for a stay of judgment pending appeal was denied.

V.

On appeal, plaintiffs assert that the trial judge erred in (1) altering the beneficiary designation on the TOD account; (2) affirming the designation of Richard as Evelyn's POA and subsequent guardian after finding a presumption of undue influence; (3) barring certain testimony of Dr. DiGregorio; and (4) failing to award legal fees and costs to plaintiffs incurred by them in the pursuit of guardianship on Evelyn's behalf and in defending the 2005 POA.

Defendant's cross appeal contends the judge failed to award sufficient fees to him incurred in the defense of the 2011 POA.

In considering these arguments, we are mindful of our limited scope of review. We will not "engage in an independent assessment of the evidence as if [we] were the court of first instance." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002) (alteration in original) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by adequate, substantial and credible evidence." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (citations omitted). Such deference is especially due when a trial judge's findings "are substantially influenced by [the judge's] opportunity to hear and see the

witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Zanman v. Felton, 219 N.J. 199, 216 (2014) (alteration in original) (citation omitted).

However, we review the trial judge's determinations on legal issues de novo. A trial judge's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995) (citations omitted).

## A.

Mindful of these standards, we turn to a review of the POA executed by Evelyn in favor of Richard in 2011.[9] Plaintiffs contend that the disparate rulings that the POA was not the product of undue influence, but the Will signed several weeks later was a result of undue influence are not supported by the credible evidence in the record. We disagree.

> [U]ndue influence is a mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets, generally by means of a will or inter vivos transfer in lieu thereof.
>
> . . . .

---

[9] Richard does not appeal the court's invalidation of the 2012 Will.

> Ordinarily, the burden of proving undue influence falls on the will contestant. Nevertheless, we have long held that if the will benefits one who stood in a confidential relationship to the testator and if there are additional 'suspicious' circumstances, the burden shifts to the party who stood in that relationship to the testator.
>
> [In re Estate of Stockdale, 196 N.J. 275, 302-03 (2008) (citing Haynes v. First Nat'l State Bank, 87 N.J. 163, 176 (1981))].

We have described a confidential relationship as one where the "the relations between the parties are of such a character of trust and confidence as to render it reasonably certain that the one party occupied a dominant position over the other and that consequently they did not deal on terms and conditions of equality." Estate of Ostlund v. Ostlund, 391 N.J. Super. 390, 402 (App. Div. 2007) (quoting Blake v. Brennan, 1 N.J. Super. 446, 454 (Ch. Div. 1948)). "[A]mong the most natural of confidential relationships is that of parent and child." Pascale v. Pascale, 113 N.J. 20, 34 (1988).

The judge found Richard had a special relationship with his mother. All witnesses agreed that Richard spent the most time with Evelyn and took care of her daily needs. Evelyn herself told many of the witnesses that she wanted Richard to be her POA because he listened to her and spent time with her. In assessing the requirement that there be "additional circumstances of a

19

suspicious character," <u>In re Will of Rittenhouse</u>, 19 <u>N.J.</u> 376, 378-79 (1955), the judge noted the involvement of attorney Manganello. She stated: "Mr. Manganello did not speak to Mrs. Worley outside of the presence of Rick. [He did] not clarify whether he represented [Evelyn] or Rick. [He did] not obtain at least a primary care physician's opinion regarding her capacity."

The judge found that the presumption of undue influence existed regarding the POA, and we are satisfied that she correctly shifted the burden to defendant to rebut the presumption.

All agreed that Evelyn did not want to stay at the assisted living facility. Within several weeks of her admission, she was voicing her desire to return to her home to everyone with whom she spoke. She told Sinclair and others that only Richard was listening to her. As the judge noted:

> Rick was acting on his mother's request in taking steps to obtain a POA and remove her from the [assisted care facility]. Mrs. Worley was sufficiently capacitated to have a say in whether she would live in facility or stay in her home with paid, in-home care service providers that she was well able to afford.

Evelyn knew what she wanted and knew that Richard was the one to effectuate her desire — by obtaining a POA and removing her from the care facility. We are satisfied that the judge's conclusion that Evelyn was not unduly influenced by Richard in obtaining the

POA for her removal from the care facility is supported by the credible evidence in the record.

In considering the 2012 Will, the evidence leads to a contrary result. Evelyn never voiced any desire to anyone to change the executor on her Will. She had executed at least two Wills prior to the 2012 version; each had Dwight as the executor. There was no evidence presented that she desired to change the executor of her Will in 2012 to Richard. We are satisfied that the judge's conclusion that Richard did not meet his burden of rebutting the presumption of undue influence is supported by the record.

We disagree with plaintiffs' argument that these rulings cannot stand as they are contrary to one another. With regard to the POA and the 2012 Will, the judge considered the presumption of undue influence and found plaintiffs had met their burden. When the burden of rebuttal shifted to defendant, the court found it was met in the case of the POA, but there was insufficient evidence presented to rebut the presumption surrounding the Will. As a result, when each document was considered separately, differing legal conclusions were properly reached. Those conclusions are supported by the credible evidence.

### B.

Fifteen years before this litigation arose, Evelyn opened a TOD account with the financial services firm where Dwight was an

A-0154-15T2

employee, thereby avoiding payment of fees and commissions. The parties stipulated that she was competent when she opened the account and that it was her signature on the application. Dwight was designated as the beneficiary of the account upon her death; that designation never changed. Evelyn executed Wills in 1993 and 2008 at which time the parties stipulated that Evelyn was competent; the TOD account was not referenced in either Will. Although Evelyn spoke on the phone several times with Waddell representatives in 2012, she never requested a change in the TOD beneficiary designation.

After determining the TOD account was not an inter vivos gift, and relying on Sinclair's testimony, the judge concluded that Evelyn wished to treat her surviving sons equally and that she had a "change of mind with respect to the TOD account."

The contradictory evidence presented, however, does not support the premise that Evelyn always treated her sons equally. There was testimony that she gave Roger more than $100,000 during his lifetime. Daniel testified that in 1997, the same timeframe as the establishment of the Waddell account with Dwight, his mother offered him a gift of $100,000 that he declined. In addition, there was testimony that there were bank accounts opened for one or two of the grandchildren, but not all nine. The assets in each

Will executed by Evelyn were to be divided equally among the three surviving sons; Roger's estate and heirs were not included.

The testimony of Sinclair considered by the judge was offered subsequent to the commencement of this litigation. Evelyn was aware of the contentious proceedings taking place among her sons and expressed her sadness at its occurrence. It is not unusual under the circumstances that she would express the general premise that she wished her sons to be treated equally. Although the judge relied on the testimony provided by Sinclair, the attorney conceded that he never asked Evelyn specifically about the TOD account or her desired beneficiary designation of it.

Although well aware of the deference due the judge's decision, we find it a leap to conclude that after so many years of the beneficiary designation remaining unchanged, Evelyn's generalized statement that she wanted all her sons to be treated equally after her death was a statement of her probable intent to change the beneficiary of the TOD account. See Stephenson v. Spiegle, 429 N.J. Super. 378, 386 (App. Div. 2013) (emphasis added) (noting the doctrine of probable intention may be used to reform mistaken testamentary dispositions).

Evelyn stated after the inception of this litigation that she loved her three sons equally. She was never specifically asked about the TOD account, but provided generalized statements that

her three sons should be treated equally. We are not satisfied that the substantial credible evidence supported changing the beneficiary designation on this non-probate asset. This litigation centered on whether Evelyn was unduly influenced by Richard to effect a POA in his favor and a new Will naming him as executor. There were no similar contentions regarding the TOD account; there were no allegations that it was wrongly established or that Evelyn was unduly influenced in her choosing just one of her sons as the beneficiary of the account. To the contrary, the parties stipulated that she was fully competent at the time of the initiation of the account. As a result, we reverse the decision of the court regarding the TOD account; the beneficiary of the account remains Dwight.

## C.

We turn to plaintiffs' argument that Richard, having been found to have unduly influenced his mother, should not be Evelyn's guardian. In giving deference to the judge's finding based on her ability to perceive witnesses and assess credibility, as we must, we find this argument to be without merit. The judge found Sinclair's report recommending that the guardianship not be split to be persuasive. She noted the inability of Dwight and Richard to cooperate throughout the litigation, and although the judge recognized Dwight's skills as a money manager, she determined a

24

shared guardianship would not be feasible based on the "likelihood of friction and . . . further litigation." We are satisfied that the judge's finding that Richard's interests are synonymous with those of Evelyn is supported by the evidence and his appointment as her guardian is correct.

D.

We briefly address plaintiffs' argument that the chancery judge erroneously barred them from questioning Dr. DiGregorio on an opinion that had not been included in her report. After the court ordered a competency exam, Evelyn was evaluated by Dr. DiGregorio, a geriatric neuropsychologist, who also performed a series of objective tests in August 2012. In her report, she concluded that Evelyn was cognitively incapacitated at that time.[10] Plaintiffs identified the doctor as a fact witness who would provide testimony regarding her evaluations.

In preparation for trial, plaintiffs scheduled a de bene esse deposition of Dr. DiGregorio. Several days before the deposition, plaintiffs advised defendant that they intended to use the doctor as an expert witness. No new report nor amended report was provided.[11] At the deposition, plaintiffs' counsel sought to

---

[10] Dr. DiGregorio performed a second evaluation and rendered an additional report in May 2013.

[11] See Rule 4:17-7.

inquire of Dr. DiGregorio her opinion on the mental capacity of Evelyn in December 2011 and January 2012 — eight months prior to the doctor's first evaluation.

We apply a deferential approach to the trial judge's decision to admit expert testimony and review it against an abuse of discretion standard. Although an expert witness is generally confined to the opinions contained in his or her report provided in discovery, Conrad v. Robbi, 341 N.J. Super. 424, 440-41 (App. Div.), certif. denied, 170 N.J. 210 (2001), "the logical predicates for and conclusions from statements made in [an expert] report are not foreclosed." McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div.), certif. denied, 108 N.J. 219 (1987).

The judge found the sought-after new opinion was not a logical predicate from the information and opinions set forth in the doctor's expert report. It was not expected that the doctor would provide an opinion about the state of Evelyn's mental capacity nine months prior to their first meeting and evaluation. There was no notice in the served reports of Dr. DiGregorio that she had read medical reports from the applicable timeframe. The new opinion was a complete surprise to defendant, leaving him without the opportunity of effective cross-examination and resulting in certain prejudice. See Westphal v. Guarino, 163 N.J. Super. 139, 146 (App. Div.), aff'd o.b., 78 N.J. 308 (1978) (noting that the

opposing party must be protected from the effect of surprise and prejudice).  We are satisfied that the trial judge did not abuse her discretion in her decision to exclude the newly offered opinion.

E.

Plaintiffs seek legal fees from (1) defendant for the breach of his fiduciary duty for exerting undue influence when exercising his POA; and (2) the Estate for legal fees and costs incurred in defending the validity of the 2005 POA.  Defendant's cross-appeal seeks legal fees for defending the POA determined by the court to be valid and enforceable.

New Jersey courts "have traditionally adhered to the American Rule as the principle that governs the allocation of attorneys' fees." Occhifinto v. Olivo Constr. Co., 221 N.J. 443, 449 (2015) (quoting Walker v. Giuffre, 209 N.J. 124, 127 (2012)).  The American Rule "prohibits recovery of counsel fees by the prevailing party against the losing party." In re Estate of Vayda, 184 N.J. 115, 120 (2005) (quoting In re Niles, 176 N.J. 282, 294 (2003)). Notwithstanding New Jersey's "strong public policy against the shifting of costs," counsel fees may be awarded in certain circumstances. Litton Indus. v. IMO Indus., 200 N.J. 372, 404-05 (2009) (quoting Vayda, supra, 184 N.J. at 120); see also R. 4:42-9(a)(1)-(8).

27

One such circumstance exists when an executor or trustee commits the tort of undue influence. "[A]n exception to the American rule is created that permits the estate to be made whole by an assessment of all reasonable counsel fees against the fiduciary that were incurred by the estate." Niles, supra, 176 N.J. at 298-99. Plaintiffs request the estate be reimbursed the monies expended by Richard to attorney Manganello for the drafting of the POA and new Will. The chancery judge declined to do so. We see no error in her ruling. As noted, although the judge found Richard had unduly influenced his mother in obtaining the POA, nevertheless, she found the document to be valid and enforceable as he was acting to achieve his mother's wishes. Richard did not strip the estate of any assets, and his actions did not rise to the pernicious level envisioned in In re Estate of Folcher, 224 N.J. 496, 511 (2016), and Niles.

As to the argument that plaintiffs are entitled to counsel fees for the defense of the 2005 POA, we find it likewise to be without merit. The 2005 POA was not the subject of the litigation. Evelyn did not wish to remain in the assisted care facility; Dwight would not listen to her wishes. Therefore, Evelyn desired a change in the POA to Richard who was willing to accede to her desire to move back to her home. The court found Evelyn had the capacity to communicate her decision for Richard to be her POA and to sign

A-0154-15T2

the legal document. The 2011 POA was the crux of the case, not the former document.

The judge awarded $2500 in fees to both parties under <u>Rule</u> 4:86-4(e), authorizing compensation of counsel fees for the party seeking guardianship. Both Dwight and Richard sought the guardianship of their mother. In assessing fees to both sides, the judge remarked that "this was not really about the guardianship . . . . Rather, this was straight-out a fight between brothers. . . . [Evelyn] should certainly not have to fund the sole source of stress in her life." We see no reason to disturb the judge's ruling.

In addressing the cross-appeal, we reiterate the premise of the American rule governing this fee consideration. We reject defendant's argument that a contractual entitlement to fees existed under the 2011 POA. Although the document contained a clause that the agent in the POA had the authority to sue and settle suits, it did not reference counsel fees. There is no pertinent exception to the American rule for the award of further fees to defendant.

The June 30, 2015 orders are affirmed with the exception of the court's ruling pertaining to the TOD account. In accordance with the above discussion, we reverse the portion of the order

29

that re-designated the beneficiary of the account and restore Dwight Worley as the account beneficiary.

Affirmed in part, reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0154-15T2